**FEDERAL DEPOSIT INSURANCE
CORPORATION, Plaintiff,**

v.

**BOWLES LIVESTOCK COMMISSION
COMPANY, et al., Defendants.**

No. CV. 87–0–420.

United States District Court,
D. Nebraska.

June 5, 1990.

---

**9.** On the contrary, each day's delay in providing relief adds to defendants' exposure to damages and attorneys' fees.

Clifford Ruder, Thaddeus G. Fenton, F.D.I.C. Legal Div., Liquidation, Kansas City, Mo., and Pamela K. Black, North & Black, Omaha, Neb., for plaintiff.

John M. Vodra and Victor J. Lich, Jr. Lich, Herold & Mackiewicz, Omaha, Neb., for defendants.

Reed Frahm, Columbus, Neb., pro se.

## MEMORANDUM OPINION

STROM, Chief Judge.

This matter is before the Court after trial to determine the extent of liability, if any, of defendant Bowles Livestock Commission Company to Federal Deposit Insurance Corporation for sales of livestock made through defendant Bowles. Pursuant to Fed.R.Civ.P. 52(a), the Court now makes the following findings of fact and conclusions of law.

The Court has jurisdiction pursuant to 12 U.S.C. § 1819. The uncontroverted facts in this proceeding are as follows:

Plaintiff, Federal Deposit Insurance Corporation (hereinafter "FDIC") is a corporation organized and existing under the laws of the United States of America, 12 U.S.C. § 1811, *et seq.* Defendant Bowles Livestock Commission Company (hereinafter "Bowles") is a sole proprietorship which at all times hereunder was doing business at 531 Livestock Exchange Building, Omaha, Nebraska. Defendant Reed Frahm is an individual who is a resident of the State of Nebraska. The Johnson County Bank, Tecumseh, Nebraska (hereinafter "Bank") was a banking corporation organized and existing under the laws of the State of Nebraska prior to February 7, 1986.

The Bank loaned to Steven G. Wehmer certain sums of money on the dates and in the amounts as follows:

| Date | Amount |
|------|--------|
| January 28, 1986 | $29,555.73 |
| January 28, 1986 | 17,700.00 |
| January 28, 1986 | 35,000.00 |

At the time each said sum was loaned to Wehmer, he executed promissory notes in favor of the Bank evidencing his indebtedness. Wehmer also executed a security agreement on January 28, 1986, in favor of the Bank covering, *inter alia,* all farm products or inventory, including livestock.

As security for Wehmer's prior indebtedness at the Bank, the Bank filed security agreements with the County Clerk of Johnson County, Nebraska, on July 8, 1974, May 20, 1980, and February 21, 1985. At various times from January 9, 1986, through January 8, 1987, hogs belonging to Wehmer were delivered to Bowles at the request of Wehmer for sale through Bowles. At various times from July 16, 1986, through January 8, 1987, hogs belonging to Wehmer were delivered to Bowles for sale under the name of "Reed Frahm" to be sold through Bowles.

At all times from January 9, 1986, through January 8, 1987, Bowles was operating as a livestock market agency and was registered under the Packers and Stockyards Act, (7 U.S.C. § 181, *et seq.*) doing business in interstate commerce. At all times from January 9, 1986, through January 8, 1987, Bowles sold the hogs of Wehmer in the ordinary course of its business to buyers who had no actual knowledge of any purported security interest in the hogs. The livestock sold by Bowles was sold at fair market value.

On or about February 7, 1986, the Department of Banking and Finance of the State of Nebraska declared the Bank insolvent and appointed the FDIC as receiver and liquidating agent of the Bank. The FDIC gave notice to Wehmer on May 5, 1986, advising him that he could not sell livestock subject to its security interest without written approval from the FDIC (Exhibit No. 116). On July 7, 1986, FDIC sent written notice to Bowles of its security interest and lien upon Wehmer's livestock (Exhibit No. 117). The net proceeds from each sale of Wehmer's livestock were delivered by Bowles to either Wehmer or Reed Frahm.

The FDIC has made demand on Bowles for the proceeds realized from the sale of livestock, but Bowles refuses to comply with plaintiff's request. The Court has previously granted the FDIC's motion for summary judgment against Reed Frahm awarding the former $42,979.45 (Filing No. 95).

The essential issue in this case is what is the extent of liability, if any, of Bowles Livestock Commission Company to the Bank's successor, the FDIC, for sales of livestock owned by Steven Wehmer made through Bowles. There are four separate

time periods in issue. The first time period is from January 9, 1986, the time the first sale of livestock in question was made, through February 7, 1986, the time the Bank was declared insolvent and the FDIC appointed as receiver and liquidating agent. The second period is from February 7, 1986, through May 5, 1986, at which time the FDIC gave notice to Steven Wehmer not to sell any property subject to its security interests without first obtaining written approval from the FDIC. The third period is from May 5, 1986, through July 7, 1986, at which time Bowles received written notice from the FDIC advising it of the latter's lien on Steven Wehmer's livestock. The fourth period is from July 7, 1986, through January 8, 1987, the time period during which Steven Wehmer consigned hogs to Bowles under the name Reed Frahm. Sales were made under Reed Frahm's name because Steven Wehmer's name appeared on the lien list distributed July 7, 1986, by FDIC.

The evidence establishes that sales of Wehmer livestock in the amount of $4,903.78 occurred during the first period listed above, January 9, 1986, through February 7, 1986. Sales in the amount of $15,304.71 occurred during the second period, February 7, 1986, through May 5, 1986. Sales in the amount of $12,315.69 occurred during the third period, May 5, 1986, through July 7, 1986. Sales in the amount of $42,979.35 were made under the name of Reed Frahm from July 16, 1986, through January 8, 1987.

Sales of hogs by Wehmer were made on an essentially continuous basis. The raising of hogs is a commodity in which sales occur as the livestock reaches an appropriate weight. Steven Wehmer testified that he first started borrowing money from the Bank for his hog operation in 1975. Although the Bank had a security interest in Steven Wehmer's livestock (Exhibit Nos. 113, 114 and 115), the Bank never objected to Wehmer selling hogs and applying the proceeds to operating expenses. The Bank was familiar with this course of dealing and never objected throughout the entire

period Wehmer conducted business with the Bank.

For the period from January 9, 1986, through February 7, 1986, the case of *Neu Cheese Co. v. FDIC*, 825 F.2d 1270 (8th Cir.1987) is applicable. In that case, the debtor was a dairy farmer and borrowed money from a bank to finance his operations. The debtor executed security agreements in favor of the bank covering the debtor's cows, milk and proceeds from the sale of milk. Over a period of approximately four years, the debtor sold his milk to Neu Cheese, a dairy which manufactured milk into specialty cheeses. The debtor deposited the proceed checks into his personal bank account with no objection from the bank.

The bank subsequently brought suit against Neu Cheese alleging that Neu Cheese had wrongfully converted the debtor's milk. The debtor filed for bankruptcy, and Neu Cheese removed the case to bankruptcy court. The bank was subsequently ordered closed and the FDIC was appointed as receiver for the bank. The primary issue before the Court was whether the bank waived its rights under the security agreements signed by the debtor which gave the bank an interest in the milk and any proceeds therefrom. In determining whether the actions of the bank constituted a waiver of the security interests, the Court referred to Neb. U.C.C. § 9–306(2) which provides in part:

> [A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis added).

Although the FDIC contended that the bank's security agreements should have placed Neu Cheese on notice so that the bank need do nothing more than rely upon its recording to protect its interest, the Court stated that the bank effectively waived its right in the collateral. *Id.* at 1273. The Court relied on the case of

*Farmers State Bank v. Farmland Foods, Inc.,* 225 Neb. 1, 402 N.W.2d 277 (1987), wherein the Nebraska Supreme Court held that a bank effectively waived its security interest where the bank knew that sales were occurring on over one hundred thirty (130) occasions over a six-year period without its consent. The Nebraska Supreme Court stated:

> We hold that performance under a security agreement, including the failure of the secured party to rebuke the debtor or object to the debtor's conduct in selling collateral in violation of the terms of the security agreement, may amount to a waiver of the lender's contractual right to require its written consent to a sale of collateral. Whether the secured party's conduct constitutes a waiver of its right to require written consent to a sale of collateral is a question of fact.

*Id.* at 9, 402 N.W.2d at 282.

■ On the facts of this case, the Court must determine whether the Bank effectively waived its interest in the hogs of Steven Wehmer. The Court finds that the Bank has waived its security interest in the hogs as the Bank knew through course of dealing that Steven Wehmer was selling hogs and placing the proceeds in his personal account for payment of operating expenses. The Bank failed to object to this conduct which was occurring on an essentially continuous basis over several years. Accordingly, defendant Bowles is not liable to the Bank's successor, the FDIC, for sales that occurred during the period of January 9, 1986, through February 7, 1986.

The Bank was declared insolvent and the FDIC appointed receiver on February 7, 1986. Generally, when the FDIC serves as receiver of a failed bank, it may pay off the bank's depositors by two methods. The first is simply to liquidate the bank's assets and pay the depositors their insured amounts, covering any shortfall with insurance funds. The FDIC tries to avoid this option, however, because it decreases public confidence in the banking system and may deprive depositors of the uninsured portions of their funds. *Grubb v. FDIC,* 868 F.2d 1151, 1155 (10th Cir.1989), citing

*FDIC v. Merchants National Bank,* 725 F.2d 634, 637 (11th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). *See also, Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). The second, and preferred alternative, is to initiate a purchase and assumption transaction. In this type of transaction, the FDIC as receiver arranges to sell acceptable assets of the failed bank to an insured, financially sound bank, which assumes all of the corresponding deposit liabilities and reopens the failed bank without an interruption in operations or loss to depositors. The FDIC as receiver then sells to the FDIC in its corporate capacity the assets that the assuming bank declined to accept. The corporate entity of the FDIC in turn attempts to collect on the unacceptable assets to minimize the loss to the insurance funds. *Grubb v. FDIC,* 868 F.2d at 1155 (citing *FDIC v. Merchants National Bank,* 725 F.2d at 637–38).

In this case, when the Department of Banking and Finance of the State of Nebraska declared the Bank insolvent on February 7, 1986, the FDIC accepted appointment as receiver of the Bank and took possession of the Bank's assets and affairs. The FDIC transferred and sold certain liabilities and assets to a second bank, the Johnson County Bank of Elk Creek, Nebraska, and transferred the remaining assets to itself in its corporate capacity according to a purchase and assumption transaction.

■ When the FDIC is deciding whether to liquidate a failed bank or to provide financing for purchases of its assets and assumption of its liabilities by another bank pursuant to 12 U.S.C. § 1823(c)(2), federal and state bank examiners are allowed to rely on bank records in evaluating the worth of the bank's assets by 12 U.S.C. § 1823(e). *See Langley v. FDIC,* 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). Specifically, 12 U.S.C. § 1823(e) provides:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for

a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

Any agreement which tends to diminish the right, title or interest of the FDIC in any asset acquired by it is not valid unless all four criteria are met. Otherwise, neither the FDIC nor state banking authorities would be able to make reliable evaluations of whether to liquidate or undertake a purchase and assumption agreement because bank records could contain seemingly unqualified notes which are in fact subject to undisclosed conditions. *Langley,* 484 U.S. at 92, 108 S.Ct. at 401–02. Further, this evaluation must be made with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services, particularly when a purchase and assumption agreement is undertaken. *Id.* at 91, 108 S.Ct. at 401.

In determining what constitutes an "agreement" for the purposes of 12 U.S.C. § 1823(e), the case of *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) is illustrative. In that case, the petitioners borrowed money from a bank insured by the FDIC to purchase land, and executed a note and other guarantees in consideration for the loan. The bank subsequently failed and the FDIC was substituted as plaintiff in an action against petitioners for principal and interest due on a note. The petitioners defended by alleging that the bank had fraudulently misrepresented the quantity of the land and the mineral assets contained thereon. The Court held that 12 U.S.C. § 1823(e) barred the defense that the note was procured by fraud in the inducement, even though the fraud did not take the form of an express promise. The Court stated:

> As a matter of contractual analysis, the essence of petitioner's defense against the note is that the bank made certain warranties regarding the land, the truthfulness of which was a condition to performance of their obligation to repay the loan.... As used in commercial and contract law, the term "agreement" often has "a wider meaning than ... promise," Restatement (Second) of Contracts, § 3, Comment *a* (1981), and embraces such a condition upon performance. The Uniform Commercial Code, for example, defines agreement as "the bargain of the parties in fact as found in their language or by implication from other circumstances...." U.C.C. § 1–201(3), 1 U.L.A. 44 (1976). Quite obviously, the parties' bargain cannot be reflected without including the conditions upon their performance, one of the two principal elements of which contracts are constructed.

*Id.* at 90–91, 108 S.Ct. at 401.

In addressing the petitioner's allegation that the FDIC was not protected by § 1823(e) because it had knowledge of the asserted defense at the time it acquired the note, the Court stated that knowledge of the misrepresentation by the FDIC prior to its acquisition of the note is not relevant to whether § 1823(e) applies. *Id.* at 94, 108 S.Ct. at 402–03. The Court stated that Congress opted for the certainty of the requirements set forth in § 1823(e). "An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew. It would be rewriting the statute to hold otherwise." *Id.* at 95, 108 S.Ct. at 403.

 In reviewing the facts of this case, it is clear that Wehmer engaged in a course of dealing of which the Bank was familiar. The Bank's continued acquiescence in Wehmer's sale of collateral subject to its security interest and use of proceeds for operating expenses effectively modified the Bank's security interest. This activity constitutes an implied agreement to alter the

Bank's right, title and interest in the collateral. The Court finds that the course of conduct and understanding between Wehmer and the Bank is an "agreement" within the contemplation of 12 U.S.C. § 1823(e). *See Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *FDIC v. Galloway*, 856 F.2d 112, 116 (10th Cir.1988) (the term "agreement" in 12 U.S.C. § 1823(e) protects the FDIC from being bound by any side agreements, understandings or representations limiting the scope of a continuous guaranty unless they have been put in writing and kept as official records).

As set forth in 12 U.S.C. § 1823(e), no agreement which tends to diminish or defeat the right, title or interest of the FDIC is valid against the FDIC unless the agreement meets each of four requirements. The claimed agreement in this case between Wehmer and the Bank did not comply with any of the requirements set forth in § 1823(e). Accordingly, the Court finds that this agreement is not valid against the FDIC and the FDIC is, therefore, not bound by the Bank's previous course of conduct when it was appointed receiver and began actions in its corporate capacity on February 7, 1986. Although Bowles alleges that the FDIC was aware of the course of dealing between Wehmer and the Bank, knowledge is irrelevant as to whether § 1823(e) applies. *Langley v. FDIC*, 484 U.S. 86, 94, 108 S.Ct. 396, 402–03, 98 L.Ed.2d 340 (1987); *FDIC v. Galloway*, 856 F.2d 112, 116 (10th Cir.1988).

Pursuant to the security agreement executed January 28, 1986, by Wehmer in favor of the Bank (Exhibit No. 112), collateral subject to the security interest included, *inter alia*, all livestock. Although the FDIC held a valid security interest in Wehmer's livestock, a subordination agreement existed which was executed on October 11, 1985, between the Bank and Central Soya Company (Exhibit No. 238). This subordination agreement provided that the Bank subordinated its perfected security interest in certain hogs of Steven Wehmer in an amount not to exceed $18,000. The subor-

dination agreement permitted the use of livestock proceeds for purchases of feed from Central Soya. Payments in the amount of $11,139.02 were made by Wehmer to Central Soya between January 9, 1986, and January 8, 1987.

To determine whether this subordination agreement is valid against the FDIC, the Court must determine whether the agreement complies with each of the four requirements of 12 U.S.C. § 1823(e). As set forth in 12 U.S.C. § 1823(e)(3), the agreement shall have been "approved by the board of directors of the depository institution or its loan committee, which approval *shall* be reflected in the minutes of said board or committee" (emphasis added). As stated by the Court in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987):

> The statutory requirements that an agreement be approved by the bank's board or loan committee and filed contemporaneously in the bank's records assure prudent consideration of the loan before it is made, and protect against collusive reconstruction of loan terms by bank officials and borrowers (whose interests may well coincide when a bank is about to fail).

*Id.* at 95, 108 S.Ct. at 403.

There has been no evidence presented to the Court establishing that the subordination agreement was reflected in the minutes of the board of directors or loan committee. Accordingly, the Court finds that the subordination agreement does not meet the requirements of 12 U.S.C. § 1823(e) and is therefore not valid against the FDIC.

Bowles argues that it cannot be held liable for conversion to the FDIC because it may claim protection under state statutory law. On the other hand, the FDIC argues that it is entitled to a uniform application of federal law and that, pursuant to federal common law, Bowles is strictly liable to it for conversion. The United States Supreme Court in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), set forth the governing principles to be

observed in determining whether, in controversies affecting operations of federal programs, resort to uniform federal rule is required. The Court referred to the decision of *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), wherein it stated that when the United States disburses its funds or pays its debts, it is exercising a constitutional function or power and the authority to do so is in no way dependent on the laws of any State. In absence of an applicable Act of Congress, it is for the federal courts to fashion the governing rule of law according to their own standards. *Kimbell Foods,* 440 U.S. at 726, 99 S.Ct. at 1457. Guided by these principles, the Court stated it was clear that the priority of liens stemming from federal lending programs must be determined with reference to federal law.

In determining what content to give to the federal law, the Court stated that controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to federal rules. Whether to adopt state law or fashion a nationwide federal rule is a matter of judicial policy "dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Id.* at 727–28, 99 S.Ct. at 1457–58. The Court stated that federal programs which by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules. Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. *Id.* at 728, 99 S.Ct. at 1458. Apart from considerations of uniformity, it must also be determined whether application of state law would frustrate specific objectives of the federal programs. If so, special rules solicitous of those federal interests must be fashioned. Finally, the choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Id.* at 727–29, 99 S.Ct. at 1457–59.

The Supreme Court found no need for a national uniform body of law to fix priorities of liens arising from voluntary loans made under SBA and FHA loan programs. The Court reasoned that the state commercial codes furnished convenient solutions which were not inconsistent with adequate protection of federal interests, and that compliance with state law would produce no hardship as the SBA individually negotiates in painfully particularized detail each of its voluntary loan transactions. *Id.* at 729–30, 99 S.Ct. at 1459.

In *FDIC v. Ritchie,* 646 F.Supp. 1581 (D.Neb.1986), this Court, speaking through then Chief Judge Beam, considered whether to apply federal common law or state law when an involuntary creditor, the FDIC, was involved. In that case, the defendants had guaranteed promissory notes executed in favor of a bank which were in default. The bank sold the collateral which secured the notes and commenced action for a deficiency judgment against the defendants in the District Court of Custer County, Nebraska. That court granted judgment on the pleadings and dismissed the action reasoning that the bank had failed to give the defendants proper notice pursuant to Neb.U.C.C. § 9–504. Subsequent to the bank perfecting an appeal to the Nebraska Supreme Court, the bank was declared insolvent and the FDIC appointed receiver. The FDIC was substituted as plaintiff and removed the case to the United States District Court.

The defendants argued that the action was barred by the doctrine of *res judicata* due to the judgment entered in the Custer County District Court, and further, that Nebraska law absolutely barred any recovery for a deficiency judgment from a debtor who had received inadequate notice of the sale of the collateral. The FDIC argued that the case was governed by federal common law rather than Nebraska law, and for that reason, neither *res judicata* nor the Nebraska absolute bar rule was applicable. *Id.* at 1582–83.

In determining whether to apply federal or state law to the matter, the Court referred to the three factors set forth in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), which require consideration of: (1) whether the federal program is one which by its nature requires nationwide uniformity, (2) whether adopting state law would frustrate the specific objectives of the federal program, and (3) whether applying federal law would disrupt commercial relations predicated on state law. *Ritchie*, 646 F.Supp. at 1583. The Court held that the issues in the proceeding were governed by federal common law. The Court reasoned that the FDIC acquired the asset in a purchase and assumption transaction following the insolvency of a bank, which generally has to be consummated with great speed in order to preserve the going concern value of the failed bank and provide some level of stability and integrity to the nation's banking system. *Id.* at 1583. The Court stated that the FDIC, in such a situation, is an involuntary creditor. It is forced to assume many of the failed bank's lesser quality assets which are not attractive to private buyers. In its corporate capacity, it attempts to collect on these assets to minimize the loss to the insurance fund. Because the FDIC becomes an involuntary creditor at a very late stage in the lending process, the FDIC is entitled to pattern its collection activities in reliance upon the uniform application of federal law. *Id.* at 1583–84.

In *FDIC v. Burwell Livestock Market, Inc.*, CV. 86–0–859 (Neb. Feb. 18, 1988), the finding and recommendations of the magistrate concerning cross-motions for summary judgment, which were adopted by this Court, set forth that a state statute which exempted an auctioneer from liability when it sold property at auction in good faith and without notice of a security interest, Neb. Rev.Stat. § 69–109.01, provided the rule of decision. The Court has reviewed that decision and to the extent it is inconsistent with this opinion, the Court rejects its opinion in *FDIC v. Burwell Livestock Market, Inc.*

Bowles contends that it is relieved of liability for all sales prior to December 24, 1986, pursuant to Neb.U.C.C. § 9–307(4) and (7). Neb.U.C.C. § 9–307(4) and (7) were operative from June 5, 1985, through December 23, 1986. *See* Neb.U.C.C. § 9–307 (Supp.1988). Specifically, they provided:

(4) A buyer who purchases farm products or a person who sells farm products for another for a fee or commission may require that the seller, under the penalties prescribed, declare and identify in writing the first security interest holder or first lienholder, as the case may be, with regard to the farm products being sold. If such buyer acts in good faith and without actual knowledge that such disclosure is other than accurate and if such seller is then tendered the total purchase price by means of a check payable to such seller and, if one be named, the named first security interest holder or first lienholder, as the case may be, and if the named first security interest holder or first lienholder authorizes the negotiation of such check, the buyer of such farm products so purchased shall take free of any security interest or lien. No buyer shall be allowed to take advantage of and apply the right of offset to defeat a priority established by any lien or security interest. The buyer's good faith reliance upon the seller not naming a security interest holder or lienholder in accordance with this subsection shall allow such buyer to take such farm products free of any security interest or lien. Any endorsement for payment made on such check shall not serve to establish or alter in any way security interest or lien priorities under Nebraska law.

\* \* \* \* \* \*

(7) A buyer who in the ordinary course of business purchases farm products from a person engaged in farming or a person who sells farm products for another for a fee or commission who wishes to avail himself or herself of the protections of subsection (4) of this section shall post, in public view in a prominent place on the premises where the transactions are initiated, or deliver, in writing

to a prospective seller at the time the transaction is initiated, the following or substantially similar notice:

### Notice to Sellers

Nebraska law, section 9–307(4), Uniform Commercial Code, provides that a buyer who purchases farm products or a person who sells farm products for another for a fee or commission may require that the seller, under the penalties of a Class I misdemeanor, declare and identify in writing the first security interest holder or first lienholder, as the case may be, with regard to the farm products being sold. If such seller is then tendered the total purchase price by means of a check payable to such seller and, if one is named, payable to the named first security interest holder or first lienholder, as the case may be, and if the named first security interest holder or first lienholder authorizes the negotiation of such check, the buyer of such farm products so purchased shall take free of any security interest or lien.

The evidence at trial established the "Notice to Sellers" provision contained in § 9–307(7) was posted on Bowles' premises at the chutes prior to all of the sales in question, and remained throughout the entire period that sales of Wehmer's livestock were occurring (Transcript of proceedings, 307:15–308:19). Beginning on November 4, 1986, purchases by Bowles were transacted upon "way bills" which contained the notice provision (Transcript of proceedings, 285:9–20). The way bill required the seller to disclose the identity of the first security interest holder as required by law, and also contained language that "the owner certifies under penalty of a Class I misdemeanor that any holder of a first security interest in the livestock has been listed above."[1] Bowles contends that state law controls in this proceeding and that its compliance with Neb.U.C.C. § 9–307(4) and (7) through the use of posted notices and waybills ren-

ders it immune from an action by the FDIC.

Under federal common law, Bowles would be strictly liable for conversion to the FDIC. In *United States v. Sommerville*, 324 F.2d 712 (3rd Cir.1963), the Farmers Home Administration (FHA) had extended loans to a farmer who executed a security agreement in favor of the FHA covering all of the farmer's livestock. Subsequently the farmer, without the knowledge or consent of the FHA, delivered the cattle covered by the agreement to the defendant auctioneer, who had no actual knowledge of the security interest, for auction. The Court held that pursuant to *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), an important federal interest was involved in the FHA loan program mandating that the Court apply federal law. The Court refused to select state law as the applicable rule and instead adopted the general federal rule of conversion holding that the auctioneer, by selling the property, "interfered with and converted the FHA's right to the chattels and therefore must be held to be strictly accountable." *Id.* at 718. *See also, United States v. Carson*, 372 F.2d 429, 435 (6th Cir.1967) (pursuant to the uniform federal rule, an auctioneer is liable for conversion to the holder of a security interest in property which he has sold even if he is unaware of the existence of the security interest.)

*United States v. Chappell Livestock Auction, Inc.*, 523 F.2d 840 (8th Cir.1975), involved an action in which the Farmers Home Administration voluntarily loaned money to farmers taking a security interest in cattle. The defendant auctioneer sold some of the encumbered cattle on behalf of the farmers and the United States sued the auctioneer for common law conversion. The Court dismissed the conversion action on motion for summary judgment applying a state statute which exempted an auctioneer from liability when he had no actual knowledge of the security interest and act-

---

1. Neb.U.C.C. § 9–307(8) provided:

Any seller who violates the disclosure requirement of subsection (4) of this section shall be guilty or a Class I misdemeanor.

ed in good faith. However, the Court specifically noted that, even though the facts warranted applying state law, the federal common law provided for strict liability in conversion. *Id.* at 842 n. 3.

In consideration of the factors set forth by the United States Supreme Court in *Kimbell Foods,* and the Court's analysis in *Ritchie,* this Court finds that federal common law provides the rule of decision in this case as the application of state law would severely frustrate the specific objectives of the FDIC when it undertakes a purchase and assumption transaction. It is an involuntary creditor at a very late stage in the lending process, and has little or no chance to evaluate the strength of the assets it acquires. The FDIC's purpose is to provide some level of stability and integrity to the nation's banking system, and it should be entitled to uniformity in the laws under which it operates in such a situation, regardless of whether the party against whom collection is sought was a party to the original loan transaction. *See FDIC v. Ritchie,* 646 F.Supp. 1581 (D.Neb.1986). Although commercial relations predicated on state law would be disrupted by the application of federal common law to the facts of this case, Congress has specifically attempted to alleviate the burden on and obstruction to interstate commerce in farm products through the Food Security Act which became operative December 23, 1986. *See* 7 U.S.C. § 1631(a) and (b). This Act of Congress sufficiently demonstrates the intention of Congress to preempt certain security interests unless the lienholder complies with certain requirements. As set forth below, this Act will afford protection to Bowles for those sales occurring subsequent to December 23, 1986.

■ Although federal common law provides the rule of decision in this case, the Court will nevertheless address those additional arguments raised by Bowles. Bowles claims protection under Neb.U.C.C. § 9-307(1) (Supp.1988) which provides:

A buyer in ordinary course of business ... other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. A buyer of farm products may be subject to a security interest under sections 52-1301 to 52-1321.[2]

This "buyer in the ordinary course" provision provides that a buyer in the ordinary course of business takes free of a perfected security interest created by his seller so long as the buyer does not know that the sale to him is in violation of the ownership rights or security interest of a third party. *See* Neb.U.C.C. § 9-307, Comment 2. However, an "exception to the exception" exists with respect to farm products. Under the farm products exception, a person buying farm products from a person engaged in farming operations does not take free of a perfected security interest created by his seller, even if he is unaware that the sale to him is inconsistent with the security interest of a third party. Bowles contends that the farm products exception does not apply to it because the hogs became "inventory" when transferred to it as a marketing agency and were not "farm products."

In interpreting the farm products exception, the Nebraska Supreme Court has looked to the status of the collateral while in the hands of the *initial* seller, as opposed to the status of the collateral while in the possession of any subsequent buyer. In *Garden City Production Credit Assoc. v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971) (overruled on other grounds), the court applied the farm products exception even where the defendant cattle buyer had purchased the cattle at a cattle lot from a livestock brokerage firm which had purchased them from the debtor rancher. *See also FDIC v. Mid-America Dairymen, Inc.,* No. 85-L-540, 1986 WL 15733 (D.Neb. Dec. 16, 1986). Accordingly, the Court finds that Bowles is not protected by Ne-

**2.** The provision "A buyer of farm products may be subject to a security interest under sections 52-1301 to 52-1321" became operative Decem-

ber 24, 1986. Neb.Rev.Stat. §§ 52-1301 to 52-1321 pertain to the establishment of a central filing system for the State of Nebraska.

braska U.C.C. § 9–307(1) as the collateral is considered to be "farm products" and not "inventory" in its hands.

■ Bowles further alleges that the FDIC waived its rights in the collateral by failing to object to the sale of hogs and the application of proceeds to operating expenses by Wehmer. "Waiver" has been defined as follows:

[A] voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed; the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right; or the intentional doing of an act inconsistent with claiming it.

*State Bank v. Scoular–Bishop Grain Co.,* 217 Neb. 379, 386, 349 N.W.2d 912, 916 (1984) (citing *Lipe v. World Insurance Co.,* 142 Neb. 22, 27, 5 N.W.2d 95, 98 (1942)).

In this case, the FDIC was appointed receiver on February 7, 1986. Less than three months later, on May 5, 1986, the FDIC expressly informed Wehmer not to sell any collateral subject to its security interest without the FDIC's written consent. Mike Malone, an FDIC Liquidation Assistant, testified that he assumed sales of hogs were occurring because livestock is a commodity which is sold when it reaches an appropriate weight. However, the Court finds that circumstances such as these do not constitute a waiver by the FDIC of its security interest, because the FDIC is given little or no chance to evaluate the strength of the assets it acquires in a purchase and assumption transaction. Here, less than three months after it purchased the assets and assumed the liabilities of the Bank, it sent express directives to Wehmer concerning the sale of the collateral. It would be unfair to the FDIC to hold that it waived its security interest

before it really had a chance to evaluate its situation and plan accordingly.

■ Bowles also contends it should be relieved of liability because of the time restraints contained in the Packers and Stockyards Act, 7 U.S.C. § 181, *et seq.* Bowles argues that the restraints, which provide for prompt sale and payment, make it impossible or prohibitively burdensome to conduct a title and lien search on every head of livestock. However, the Court finds this argument unpersuasive. The Court has failed to find, nor do the parties cite, any case law specifically standing for such a proposition.

■ Congress has specifically attempted to alleviate the burden on and obstruction to interstate commerce in farm products through the Food Security Act, 7 U.S.C. § 1631. The provisions of this statute became effective December 23, 1986. *See* 7 U.S.C. § 1631(j). Commission merchants and selling agents may protect themselves from security interests by complying with the dictates of the Food Security Act. Here, the provisions of 7 U.S.C. § 1631(g) are particularly applicable and provide:

**(g) Commission merchants or selling agents: sales free of or subject to security interest; law governing "receipt"**

(1) Except as provided in paragraph (2) and notwithstanding any other provision of Federal, State, or local law, a commission merchant or selling agent who sells, in the ordinary course of business, a farm product for others, shall not be subject to a security interest created by the seller in such farm product even though the security interest is perfected and even though the commission merchant or selling agent knows of the existence of such interest.

(2) A commission merchant or selling agent who sells a farm product for others shall be subject to a security interest created by the seller in such farm product if—

. . . . .

**(C)** in the case of a farm product produced in a State that has established a central filing system—

**(i)** the commission merchant or selling agent has failed to register with the Secretary of State of such State prior to the purchase of farm products; and

**(ii)** the secured party has filed an effective financing statement or notice that covers the farm products being sold; or

**(D)** in the case of a farm product produced in a State that has established a central filing system, the commission merchant or selling agent—

**(i)** receives from the Secretary of State of such State written notice as provided in subsection (c)(2)(E) or (c)(2)(F) of this section that specifies both the seller and the farm products being sold by such seller as being subject to an effective financing statement or notice; and

**(ii)** does not secure a waiver or release of the security interest specified in such effective financing statement or notice from the secured party by performing any payment obligation or otherwise.

Nebraska has established a central filing system effective December 24, 1986, within the meaning of 7 U.S.C. § 1631. *See* Neb. Rev.Stat. §§ 52–1301, *et seq*. Accordingly, Bowles will be liable to the FDIC for sales occurring subsequent to December 23, 1986, if the provisions of either § 1631(g)(2)(C) or § 1631(g)(2)(D) have been met. This requires a determination of whether an "effective financing statement" has been filed by the FDIC. The term "effective financing statement" is defined in 7 U.S.C. § 1631(c)(4).

The Court finds that the FDIC has failed to establish that an effective financing statement within the meaning of 7 U.S.C. § 1631(g)(2) has been filed. Therefore, Bowles is not liable for those sales that occurred after December 23, 1986, in the approximate amount of $3,953.73. While financing statements were filed with the County Clerk of Johnson County, Nebraska, there is no evidence that financing statements which comply substantially with § 1631(c)(4) were filed with the Secretary of State.

The evidence shows that it was the customary practice of Bowles to compare the names on the lien lists it received with the names listed on the waybills. A waybill is generally presented by a trucker when delivering a load of livestock to Bowles and reflects the name of the owner of the livestock. When the lien list contains the name of a person listed on the waybill, Bowles issues a joint check to the owner and the secured party. After Steven Wehmer's name appeared on the lien list distributed to Bowles on July 7, 1986, hogs were sold under Reed Frahm's name. The evidence shows that Frahm endorsed the sale proceeds checks from Bowles and submitted the sums to Steven Wehmer. In this manner, Steven Wehmer ultimately received the proceeds from the sale of hogs bypassing FDIC's security interest. As a direct result of the fraudulent activity of Reed Frahm, sales of hogs subject to FDIC's security interest were occurring without the FDIC's name being listed on the proceeds checks. For those sales of hogs occurring during the period from July 16, 1986, through December 23, 1986, in the amount of $39,025.72, the Court finds Bowles is entitled to be indemnified by Reed Frahm.

Sales in the amount of $66,646.02 occurred from February 7, 1986, through December 23, 1986, in violation of FDIC's security interest. Plaintiff has submitted an affidavit stating that there is presently due and owing to the FDIC on the promissory notes the principal sum of $59,497.25. The amount of recovery of a secured party is limited by the amount of the underlying obligation. *See* Neb.Rev.Stat. § 9–501(3)(a) (Reissue 1980); *Chadron Energy Corp. v. First National Bank*, 221 Neb. 590, 379 N.W.2d 742 (1986). Accordingly, the FDIC is entitled to judgment against Bowles in the amount due to the extent of the underlying obligation of $59,497.25, plus interest accrued as of November 17, 1989, in the amount of $21,951.11, plus interest accruing at the rate of $23.3764 per day from November 17, 1989. Further, the Court

finds that Bowles is entitled to judgment on its cross-claim against defendant Reed Frahm for indemnification for sales that occurred from July 16, 1986, through December 23, 1986, under Reed Frahm's name in the amount of $39,025.72, plus interest. A separate order in accordance with this opinion will be issued this date.

## ORDER

This matter is before the Court on defendant's motion for new trial and amendment of judgment (Filing No. 103), and motion for leave to amend motion for new trial and amendment of judgment (Filing No. 112). The Court will grant defendant's motions for amendment of judgment, but finds that a new trial is not warranted. The Court will vacate its memorandum opinion and order dated November 17, 1989, and will issue a new memorandum opinion and order this date.

IT IS ORDERED that the memorandum opinion and order of the Court dated November 17, 1989 (Filing Nos. 101 and 102), are vacated.