937 F.2d 1350
 15 UCC Rep.Serv.2d 391
 FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate
Capacity, Appellee,
v.
BOWLES LIVESTOCK COMMISSION COMPANY, a Sole Proprietorship, Appellant,
Reed Fraham, an Individual.
 No. 90-2117.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 9, 1991.
Decided July 3, 1991.
 
 John M. Vodra, Omaha, Neb., argued, for appellant. Victor J. Lich, Jr., Omaha, Neb., and E. Lawrence Oldfield, Oakbrook, Ill., appeared on appellant's brief.
 John A. Anderson, Omaha, Neb., argued, for appellee. Ann S. DuRoss, Joan E. Smiley and E. Whitney Drake, Washington, D.C., appeared on appellee's brief.
 Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Bowles Livestock Commission Company (Bowles) appeals the district court's final judgment and order in favor of the Federal Deposit Insurance Corporation (FDIC) in the FDIC's action for conversion against Bowles for its sale of certain livestock in which the FDIC had a security interest. We must decide who bears the loss for the failures of a certain hog farmer and a certain bank in Nebraska. Despite the never-lose position the FDIC ordinarily enjoys in the interests of sound national banking, we conclude that here the district court misapplied the law and that the FDIC cannot recover from Bowles. We therefore reverse the judgment of the district court.
 
 I. BACKGROUND
 
 2
 We borrow liberally from the district court's published opinion for our recitation of the facts.[1]Bowles ... is a sole proprietorship which at all times hereunder was doing business at 531 Livestock Exchange Building, Omaha, Nebraska.... Reed Frahm is an individual who is a resident of the State of Nebraska. The Johnson County Bank, Tecumseh, Nebraska (hereinafter "Bank") was a banking corporation organized and existing under the laws of the State of Nebraska prior to February 7, 1986.
 
 
 3
 The Bank loaned to Steven G. Wehmer [three] certain sums of money on [January 28, 1986]. At the time each said sum was loaned to Wehmer, he executed promissory notes in favor of the Bank evidencing his indebtedness. Wehmer also executed a security agreement on January 28, 1986, in favor of the Bank covering, inter alia, all farm products or inventory, including livestock.
 
 
 4
 ....
 
 
 5
 At various times from January 9, 1986, through January 8, 1987, hogs belonging to Wehmer were delivered to Bowles at the request of Wehmer for sale through Bowles. At various times from July 16, 1986, through January 8, 1987, hogs belonging to Wehmer were delivered to Bowles for sale under the name of "Reed Frahm" to be sold through Bowles.
 
 
 6
 At all times from January 9, 1986, through January 8, 1987, Bowles was operating as a livestock market agency and was registered under the Packers and Stockyards Act ... doing business in interstate commerce. At all times from January 9, 1986, through January 8, 1987, Bowles sold the hogs of Wehmer in the ordinary course of its business to buyers who had no actual knowledge of any purported security interest in the hogs. The livestock sold by Bowles was sold at fair market value.
 
 
 7
 On or about February 7, 1986, the Department of Banking and Finance of the State of Nebraska declared the Bank insolvent and appointed the FDIC as receiver and liquidating agent of the Bank. The FDIC gave notice to Wehmer on May 5, 1986, advising him that he could not sell livestock subject to its security interest without written approval from the FDIC (Exhibit No. 116). On July 7, 1986, FDIC sent written notice to Bowles of its security interest and lien upon Wehmer's livestock (Exhibit No. 117). The net proceeds from each sale of Wehmer's livestock were delivered by Bowles to either Wehmer or Reed Frahm.
 
 
 8
 ....
 
 
 9
 The essential issue in this case is what is the extent of liability, if any, of Bowles ... to the Bank's successor, the FDIC, for sales of livestock owned by Steven Wehmer made through Bowles. There are four separate time periods in issue. The first ... is from January 9, 1986, the time the first sale of livestock in question was made, through February 7, 1986, the time the Bank was declared insolvent and the FDIC [was] appointed as receiver and liquidating agent. The second period is from February 7, 1986, through May 5, 1986, at which time the FDIC gave notice to Steven Wehmer not to sell any property subject to its security interests without first obtaining written approval from the FDIC. The third period is from May 5, 1986, through July 7, 1986, at which time Bowles received written notice from the FDIC advising it of the latter's lien on Steven Wehmer's livestock. The fourth period is from July 7, 1986, through January 8, 1987, the time period during which Steven Wehmer consigned hogs to Bowles under the name Reed Frahm. Sales were made under Reed Frahm's name because ... Wehmer's name appeared on the lien list distributed July 7, 1986, by FDIC [which required the FDIC be a joint-payee of checks from Bowles].
 
 
 10
 ....
 
 
 11
 Sales of hogs by Wehmer were made on an essentially continuous basis. The raising of hogs is a commodity in which sales occur as the livestock reaches an appropriate weight. Steven Wehmer testified that he first started borrowing money from the Bank for his hog operation in 1975. Although the Bank had a security interest in Steven Wehmer's livestock ..., the Bank never objected to Wehmer selling hogs and applying the proceeds to operating expenses. The Bank was familiar with this course of dealing and never objected throughout the entire period Wehmer conducted business with the Bank.
 
 
 12
 Bowles, 739 F.Supp. at 1366-67.
 
 
 13
 Wehmer, of course, used Frahm to fraudulently sell his livestock and avoid the issuance of the joint-payee checks to the FDIC.[2] As long as Frahm brought the livestock in at Bowles, no one was the wiser when Frahm later signed over the sales proceeds checks to Wehmer, who could spend the proceeds as he saw fit, regardless of the security interest held by, and his indebtedness to, the FDIC. Wehmer and Frahm are the culpable parties in this scheme.
 
 
 14
 Wehmer later filed for bankruptcy. The FDIC was left with the notion that it should get its bad loans satisfied by the livestock auctioneer, Bowles, and sued it for conversion. The FDIC also sued Frahm, and the district court granted summary judgment to the FDIC against Frahm for his part in the scheme, which judgment is not before this court.
 
 
 15
 The district court considered the liability of Bowles in the time frames set out above. For the period before the FDIC acquired an interest in the Bank's notes from Wehmer (up to February 7, 1986), the court concluded that the course of conduct between the Bank and Wehmer evidenced a waiver by the Bank of its security interests in Wehmer's hogs. The FDIC could not recover from Bowles for these early sales. However, we are only concerned with the court's decision as to sales of livestock after February 7, 1986, when the FDIC became the receiver of the Bank, through December 23, 1986, when the Food Security Act took effect, and, according to the district court, cut off the FDIC's cause of action against Bowles. Id. at 1375-76. During this period, the district court concluded that Bowles was strictly liable in conversion to the FDIC pursuant to federal common law. Id. at 1373.
 
 
 16
 The Food Security Act, 7 U.S.C. Sec. 1631 (1988), provides that commission merchants like Bowles may escape the snag of security interests in farm products they sell unless certain conditions are met with respect to the filing of financing statements. The district court concluded that the FDIC had failed to "establish that an effective financing statement within the meaning of [the Food Security Act] ha[d] been filed." Bowles, 739 F.Supp. at 1376. Thus, Bowles' liability to the FDIC ended with the beginning of the absolution from Congress on December 23, 1986, and Bowles was not liable for sales after that date. The district court also concluded that Bowles was due indemnification from Reed Frahm for those sales he made of Wehmer's livestock through Bowles from July 16 to December 23, 1986. Id.
 
 II. DISCUSSION
 
 17
 For the February to December 1986 sales, the district court decided that under federal common law extant in other circuits Bowles was strictly liable to the FDIC for conversion for the sale of Wehmer's hogs. The court relied on United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) and FDIC v. Ritchie, 646 F.Supp. 1581 (D.Neb.1986), to bolster its view and concluded that "because the FDIC becomes an involuntary creditor [by taking over failed banks] ... [it] is entitled to pattern its collection activities in reliance upon the uniform application of federal law." Bowles, 739 F.Supp. at 1372 (citing Ritchie ). While we do not disagree that federal law must control, we depart from the district court's judgment about the content of the federal law. Though uniformity certainly makes things easier for the FDIC in the analysis made by the district court, we believe that state law here informs the content of the federal law and that such application is consistent with Kimbell Foods and controlling precedent from this court and does not contravene the purposes and goals of the FDIC.
 
 
 18
 We cannot, it seems, escape United States v. Chappell Livestock, 523 F.2d 840 (8th Cir.1975) (en banc). Though in that case we indicated that federal law would hold an auctioneer strictly liable for conversion, we did not apply that law--we applied state law. This author dissented from Chappell, but I now must recognize the case as controlling precedent. That case stands for the proposition that despite the interest of the United States in chattels, state law governs a conversion action respecting that chattel. The reliance of commercial parties on the governance of local rules outweighed the interests of federal uniformity, particularly when the federal program in question was intended to achieve local results. Id. at 841.[3]
 
 
 19
 Bowles does not invoke the statute which we deemed controlled in Chappell, Neb.Rev.Stat. Sec. 69-109.01 (Reissue 1990), which specifically exempts innocent auctioneers from conversion actions. If that statute were involved, stare decisis would leave no room for argument. As it is, this case invokes the Uniform Commercial Code (UCC) of Nebraska and its exception to the farm products exception of Sec. 9-307(1). Nevertheless, we believe the reasoning that supported application of Nebraska's conversion law in Chappell, cannot be denied in this case as to application of the State's UCC.[4] The notion of turning to state law for the source of a federal rule of decision is hardly foreign and often simply makes good sense. See United States v. Conrad Publishing Co., 589 F.2d 949, 953 (8th Cir.1978) ("In the absence of some overriding federal interest in uniformity, the applicable state law generally provides the rule of decision.") (citations omitted).
 
 
 20
 Though Kimbell Foods was decided after Chappell Livestock was decided, and though Kimbell Foods provides guidelines for the determination of when to fashion and apply federal law, we still must follow prior decisions of this court. A panel of this court is not free to circumvent prior panel decisions, much less en banc decisions, absent a clear indication that those decisions are overruled. There are no such indications as to Chappell Livestock; the citation to Chappell in Kimbell, see Kimbell Foods, 440 U.S. at 726 n. 16, 99 S.Ct. at 1457 n. 16, makes no suggestion that Chappell was wrongly decided. Even without Chappell Livestock as binding precedent, we are not convinced that Kimbell Foods would compel the result the FDIC seeks.
 
 
 21
 The criteria to be weighed tip the balance in favor of using state law in this instance for many of the same reasons the Court identified in Kimbell Foods. The FDIC's security interests here are created by the laws of Nebraska and can be resolved by resort thereto. "Because the state commercial codes 'furnish convenient solutions in no way inconsistent with adequate protection of the federal interest[s],' United States v. Standard Oil Co., [332 U.S. 301], 309 [67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947) ], we decline to override intricate state laws of general applicability on which private creditors base their daily commercial transactions." Kimbell Foods, 440 U.S. at 729, 99 S.Ct. at 1459. Just as the Supreme Court concluded that "[i]ncorporating state law to determine the rights of the United States as against private creditors ... in no way hinder[ed] administration of the SBA and FHA loan programs," id., we conclude that our similar use of state law here will not hamper the operation of the FDIC. Nebraska law controls as the source of the federal law in this case.
 
 
 22
 Having determined that Nebraska law is the controlling federal law, we must apply it to the facts of this case. The applicable UCC provisions of Nebraska law were discussed by the district court prior to its conclusion that the federal common law of conversion controlled. See Bowles, 739 F.Supp. at 1372-73. The relevant section and paragraphs are Sec. 9-307(4) and (7).[5] These two paragraphs appeared as part of the Nebraska law for only a brief period of time, yet they were effective during the time the FDIC complains of conversion by Bowles. The district court noted they "were operative from June 5, 1985, through December 23, 1986." Id. at 1372. The paragraphs provided protection from security interests to buyers and auctioneers like Bowles by requiring the posting of notices. In 1986, Nebraska repealed these paragraphs and established a central filing system in accord with the Food Security Act. Id. at 1376 (citing Neb.Rev.Stat. Secs. 52-1301 to -1321) (current version at Reissue 1988).[6]
 
 
 23
 During the time when paragraphs (4) and (7) were in effect, Bowles complied with them. "The evidence at trial established the 'Notice to Sellers' provision contained in Sec. 9-307(7) was posted on Bowles' premises at the chutes prior to all of the sales in question, and remained throughout the entire period that sales of Wehmer's livestock were occurring (Transcript of proceedings, 307:15-308:19)." Id. at 1373. On November 4, 1986, when Bowles began using way bills, the notices were printed thereon. Id. (citing Transcript at 285).
 
 
 24
 By providing the notice required by paragraph (7), Bowles was entitled to the protection of paragraph (4). "The buyer's [Bowles] good faith reliance upon the seller [Wehmer and Frahm] not naming a security interest holder or lienholder [the FDIC] in accordance with this subsection shall allow such buyer to take such farm products free of any security interest or lien." Neb.Rev.Stat. Sec. 9-307(4) (R.S.Supp., 1986). There is no evidence that Wehmer, his father, or Frahm named the FDIC as a holder of a security interest in the hogs sold through Bowles, other than the single instance in July 1986, see supra, note 2. Thus, the FDIC cannot maintain its action for conversion because Bowles sold the hogs free of the FDIC's security interest.[7]
 
 
 25
 Reduced to its essence this case asks only whether the FDIC may trump the ordinary operation of state laws. Precedent from this court cannot be as easily put aside as the FDIC would like, and instead mandates that the laws of Nebraska supply the substance of the federal law. As it turns out, the Nebraska laws have largely the same effect as what is now the federal statutory law under the Food Security Act. The demise of the farm products exception is almost certainly complete. While the FDIC might have hoped that the federal common law of conversion would avoid the loss it faced under the relevant Nebraska laws, we have no doubt that the FDIC knew the state laws governing its security interests and the vitality of state laws in this court.
 
 III. CONCLUSION
 
 26
 We are satisfied that the result we have reached is not only correct under the law, but that it also fairly burdens the responsible party. Precedent from this court, consistent with the law from the Supreme Court, mandates that state laws provide the content of the controlling federal law of this case. The relevant state laws here are in the Nebraska UCC. Because Bowles complied with the applicable provisions of the Nebraska UCC, it sold the hogs free of the security interest claimed by the FDIC. The FDIC may not recover in conversion from Bowles based on that interest. Accordingly, the judgment of the district court is reversed and the case remanded for proceedings consistent with this opinion.
 
 
 27
 JOHN R. GIBSON, Circuit Judge, dissenting.
 
 
 28
 I respectfully dissent, essentially for the reasons set forth by the district court in FDIC v. Bowles Livestock Commission Co., 739 F.Supp. 1364 (D.Neb.1990).
 
 
 29
 The court today does not reach the question of the applicability of 12 U.S.C. Sec. 1823(e) (1988). The district court properly applied section 1823(e) to this case, and it is dispositive of the issues before us.
 
 As the district court stated:
 
 30
 [I]t is clear that Wehmer engaged in a course of dealing of which the Bank was familiar. The Bank's continued acquiescence in Wehmer's sale of collateral subject to its security interest and use of proceeds for operating expenses effectively modified the Bank's security interest. This activity constitutes an implied agreement to alter the Bank's right, title and interest in the collateral. The Court finds that the course of conduct and understanding between Wehmer and the Bank is an "agreement" within the contemplation of 12 U.S.C. Sec. 1823(e). See Langley v. FDIC, 484 U.S. 86 [108 S.Ct. 396, 98 L.Ed.2d 340] (1987); FDIC v. Galloway, 856 F.2d 112, 116 (10th Cir.1988).
 
 
 31
 Bowles, 739 F.Supp. at 1369-70. Because the agreement between Wehmer and the Bank was not in writing, it did not meet the requirement of section 1823(e)(1), and thus was not valid against the FDIC.
 
 
 32
 Little is to be gained by further discussion of issues that the district court treated so thoroughly. I would affirm the district court's judgment.
 
 
 
 [1]
 The district court's opinion is published as FDIC v. Bowles Livestock Commission Co., 739 F.Supp. 1364 (D.Neb.1990)
 
 
 [2]
 After the FDIC notified Bowles that Wehmer's proceeds checks should be issued with the FDIC as a joint-payee, apparently only one sale was made under the Wehmer name. Steven Wehmer's father, Gaylord, routinely transported Steven's hogs and made a sale of some hogs through Bowles on July 9, 1986. The check from that sale was made out with the FDIC as a joint-payee. Transcript at 275. Thereafter, however, Frahm began making the sales for Steven. See Exhibit No. 119 at 16-31. The proceeds were not made payable to the FDIC, but to Frahm, who would later remit them to Steven Wehmer
 
 
 [3]
 Under the facts of this particular case, we point out that the concerns for the uniform operation of a federal program which might counsel in favor of a singular rule of federal law are simply not present. The FDIC acquired Wehmer's notes on February 7, 1986, yet it did not notify him until May that he should not sell his hogs without FDIC approval. Bowles was not advised until July. The FDIC never complained of any sales until Wehmer filed for bankruptcy the following year. By then, Frahm and Wehmer had been apparently duping Bowles and the FDIC alike. While it may be true that the FDIC made an overnight decision to keep the Wehmer notes, it should (and could) then have acted more diligently to protect its interest in those notes. In short, these facts hardly demonstrate the kind of overnight transaction that generally warrants advantage to the FDIC
 
 
 [4]
 In this regard, United States v. Progressive Farmers Marketing Agency, 788 F.2d 1327 (8th Cir.1986), is instructive reading. That case also involved the sale of hogs through a commission merchant. There, too, we concluded that the applicable state law (of Iowa) provided the federal rule of decision. We held that the commission merchant was not liable to the FmHA for hog sales, particularly in light of subsequent legislative pronouncements in Iowa and in Congress (by the Food Security Act) as to the farm products exception
 
 
 [5]
 These paragraphs read as follows:
 (4) A buyer who purchases farm products or a person who sells farm products for another for a fee or commission may require that the seller, under the penalties prescribed, declare and identify in writing the first security interest holder or first lienholder, as the case may be, with regard to the farm products being sold. If such buyer acts in good faith and without actual knowledge that such disclosure is other than accurate and if such seller is then tendered the total purchase price by means of a check payable to such seller and, if one be named, the named first security interest holder or first lienholder, as the case may be, and if the named first security interest holder or first lienholder authorizes the negotiation of such check, the buyer of such farm products so purchased shall take free of any security interest or lien. No buyer shall be allowed to take advantage of and apply the right of offset to defeat a priority established by any lien or security interest. The buyer's good faith reliance upon the seller not naming a security interest holder or lienholder in accordance with this subsection shall allow such buyer to take such farm products free of any security interest or lien. Any endorsement for payment made on such check shall not serve to establish or alter in any way [sic] security interest or lien priorities under Nebraska law.
 ....
 (7) A buyer who in the ordinary course of business purchases farm products from a person engaged in farming or a person who sells farm products for another for a fee or commission who wishes to avail himself or herself of the protections of subsection (4) of this section shall post, in public view in a prominent place on the premises where the transactions are initiated, or deliver, in writing to a prospective seller at the time the transaction is initiated, the following or substantially similar notice:
 Notice to Sellers
 Nebraska law, section 9-307(4), Uniform Commercial Code, provides that a buyer who purchases farm products or a person who sells farm products for another for a fee or commission may require that the seller, under the penalties of a Class I misdemeanor, declare and identify in writing the first security interest holder or first lienholder, as the case may be, with regard to the farm products being sold. If such seller is then tendered the total purchase price by means of a check payable to such seller and, if one is named, payable to the named first security interest holder or first lienholder, as the case may be, and if the named first security interest holder or first lienholder authorizes the negotiation of such check, the buyer of such farm products so purchased shall take free of any security interest or lien.
 Neb.Rev.Stat. Sec. 9-307(4) and (7) (R.S.Supp., 1986).
 
 
 [6]
 In essence, the Nebraska provisions involved here operated as an interim solution to the problem created by the "farm products exception" of UCC Sec. 9-307(1) and identified and resolved by Congress in the Food Security Act. See 7 U.S.C. Sec. 1631(a) (1988) (congressional finding that the farms product exception found in many state laws "constitutes a burden on and an obstruction to interstate commerce in farm products."). See also Neb.Rev.Stat. Sec. 9-307(1) (1990 R.S.Cum.Supp.)
 
 
 [7]
 Given our holding on this point, we do not reach the merits of any of Bowles' other arguments or the district court's conclusions with respect to waiver by the FDIC or the (in)applicability of 12 U.S.C. Sec. 1823(e)