Mary E. NOLTING, Appellant,

v.

**YELLOW FREIGHT SYSTEM, INC., Appellee.**

No. 85–1711.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 17, 1986.

Decided Aug. 25, 1986.

Mark W. Cowing, Kansas City, Mo., for appellant.

Ronald E. Sandhous, Overland Park, Kan., for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Mary Nolting appeals the order of the district court[1] dismissing her claim of age discrimination against her former employer, Yellow Freight System, Inc. (Yellow Freight). After a six-day trial, a jury rendered a verdict in favor of Yellow Freight. On appeal, Nolting contends that the district court erred in submitting three instructions to the jury and in denying her motion to reconsider a partial summary judgment order. For the reasons set forth below, we affirm.

## I. BACKGROUND

Mary Nolting was born on August 12, 1929. Yellow Freight hired her in August of 1957 to work as a data entry operator. She continued in this position until her layoff and termination in 1980.

Due to adverse economic conditions, Yellow Freight in 1980 implemented a nationwide reduction in force. At the time of the personnel reduction, the data entry department consisted of thirty-six employees, eleven of whom were between forty and seventy years of age. Yellow Freight based the layoff and termination decisions on the results of an "Operator Evaluation System" previously devised by Yellow Freight to measure job performance and productivity primarily for determining pay increases. The system evaluated five factors: non-paid absence, non-productive time, operator performance, keystrokes per hour, and cost per thousand keystrokes. The system did not measure the operators' accuracy (rate of keystroke errors). By assigning points to each factor based upon the operator's monthly performance, the Operator Evaluation System yielded a "weighted average" score.

In anticipation of the reduction in force, Yellow Freight determined each operator's "weighted average" score for the calendar year 1979, and ranked the operators according to their scores. In January of 1980, Yellow Freight terminated the five operators with the lowest scores, and temporarily laid off eleven operators with the next lowest scores. Because Nolting had the ninth lowest score, she was one of the operators laid off. Of the sixteen employees affected by this action, nine were between forty and seventy years of age: two were terminated and seven were placed on layoffs.

Pursuant to Yellow Freight's personnel policy, employees on temporary layoff retained recall rights for six months but were terminated if not recalled within that time. From January through July of 1980, Yellow Freight's business continued to decline.[2] During this period some of the operators who had been laid off resigned and one operator not laid off resigned. Yellow Freight recalled some of the operators on layoff according to their weighted average ranking, but none were recalled after April of 1980. On June 25, 1980, Yellow Freight notified Nolting by letter that she would be terminated effective July 9, 1980. As of that date, Yellow Freight also terminated four other operators who had never been recalled. All of the operators terminated in July were between forty and seventy years of age. After these terminations, Yellow Freight had retained only twenty-

---

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

2. Yellow Freight offered evidence that from 1979 to 1980, its business in total shipments declined as follows: first quarter—9%; second quarter—19%; third quarter—27%; fourth quarter—26%.

two operators, six of whom were between the ages of forty and seventy.[3]

Believing that her layoff and discharge violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 (ADEA or the Act), Nolting retained attorney James Brown in July of 1980 to represent her. Although Brown told Nolting that he had filed the action in 1980, he did not in fact file the complaint until July 8, 1982. Yellow Freight responded that the statute of limitations barred the action because the applicable two-year statute of limitations[4] began to run when the plaintiff received notice of an alleged violation of the Act, and more than two years had elapsed from the date of Yellow Freight's termination letter (June 25, 1980) to the July 8, 1982 filing. In opposition to the summary judgment motion, Nolting's attorney conceded that "Plaintiff will not contest that her claim is barred by the two-year statute of limitations." On March 28, 1983, the district court granted Yellow Freight's motion for summary judgment except as to Nolting's claim of a willful violation of the Act to which a three-year statute of limitation applies.[5]

In February of 1984, Nolting retained different counsel to represent her in this action. On June 7, 1984, the district court ordered the parties to complete all pretrial filings by June 17, 1984. The district court held a final pretrial conference on August 29, 1984. The following day Nolting's attorney filed a motion to reinstate the original claim under the two-year statute of limitations, or for reconsideration of the partial summary judgment order. Concluding that the motion had been filed too late in the action, the district court denied it on the first day of trial.

At trial, Nolting sought to prove her claim of age discrimination under the disparate impact theory. It was undisputed that Yellow Freight determined the terminations and layoffs solely upon the operators' weighted average scores. Nolting offered the expert testimony of Dr. Robert Carlson, a statistician. A major premise of Carlson's analysis was that the operators were equal in all respects other than age. Accordingly, based upon the age of each operator as of January 1, 1980, Carlson compared the number of operators between forty and seventy years of age affected by the reduction in force to the number of younger operators similarly affected. Taking into account all of the data entry operator layoffs and terminations in January and July of 1980, Nolting's expert determined that the reduction in force had a more severe impact on operators between forty and seventy years of age than on younger operators. Carlson concluded that the number or percentage of operators in the protected age group affected by the two reductions was greater than could have occurred by chance, and could not have occurred without consideration of another factor.

In the opinion of Nolting's expert, the Operator Evaluation System heavily emphasized speed, and the number of keystrokes per hour constituted the most important single factor in the "weighted score." Carlson found a statistically significant relationship between the operators' age and number of keystrokes per hour: operators in the protected age group produced an average of 14,400 keystrokes per hour as compared with an average of 16,540 keystrokes per hour produced by younger operators. From this, Nolting's expert testified that Yellow Freight's reliance on the weighted scores in termination and layoff decisions produced a disparate impact on

3. Three operators reached their fortieth birthday between January and July of 1980.

4. 29 U.S.C. § 626(e)(1) incorporates by reference into the ADEA, the statute of limitations for the Fair Labor Standards Act, 29 U.S.C. § 255. Section 255 provides in pertinent part:
(a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, *except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;* (emphasis added).

5. *See* footnote 4.

workers between forty and seventy years of age.

In response, Yellow Freight offered the expert opinion of Dr. Jaris Flora, who is also a statistician. Flora criticized the type of tests and the methodology employed by Nolting's expert, in particular, because Carlson (1) improperly commingled the results of two separate events (the job actions in January and July of 1980) into a single event; and (2) failed to consider the ages of operators as of July 1980 (at which time three of the operators retained by Yellow Freight had turned forty). Based on a multiple regression analysis, Yellow Freight's expert determined that no statistically significant relationship existed between an operator's age and weighted score. Further, based on this analysis, Flora adjusted the weighted average scores to be completely age-neutral. Reranking the operators based upon these age-neutral scores produced virtually no change in the ranking order of the operators. Specifically, even with an age adjusted score, Nolting had the ninth lowest score of all the operators and would have not have retained her job.[6]

Flora further testified that the Operator Evaluation System served Yellow Freight's objective of retaining the most productive employees. Flora multiplied each operator's keystrokes per hour by her productive hours and divided that figure by the total number of hours worked to measure the number of keystrokes per production hour. Flora designed this alternative measurement to rank the operators solely on the basis of productivity. Again, had Yellow Freight employed this measurement, instead of the weighted scores, virtually the same group of employees would have been retained. Flora also determined that the group of operators terminated produced an average of 10,824 keystrokes per production hour, while the group of operators retained produced an average of 13,706 keystrokes per production hour. Based on

this comparison, Flora testified that the operators retained by Yellow Freight were capable of producing an average of 26.6% more work than the group of operators terminated.

To refute Carlson's opinion that "keystrokes per hour" constituted the most significant factor in the termination decisions, Flora compared the group of operators who were terminated (in January and July of 1980) with the group of operators retained by Yellow Freight. Based on a discriminate analysis comprised of seven variables, including the five elements of the Operator Evaluation System plus the factors of seniority and age, Flora concluded that the only two factors predictive of termination were the operator performance score (which compared the operator's keystroke rate against the department's average keystroke rate) and the unproductive time score (which measured the number of hours spent on the job *not* performing data entry functions). In sum, Yellow Freight's expert concluded that Yellow Freight had terminated operators not on the basis of age but rather upon a combination of the operator performance and nonproductive time scores.

After considering this expert evidence and the other evidence offered at trial, the jury rendered a verdict in favor of Yellow Freight. This appeal followed.

## II. DISCUSSION

### A. Willful Violation of the ADEA

#### 1. Statute of Limitations

█ Nolting first asserts that the district court erred in giving the jury a verdict director which included the following explanation of a willful violation of the Act:

> The phrase "willfully violated the Age Discrimination in Employment Act" as used in this instruction means:
>
> (1) that defendant knew or suspected that by using the operator evaluation system to determine who would be laid

---

**6.** Nolting had the ninth lowest weighted score; with the age adjustment, she tied for the ninth

lowest score.

off, employees between the ages of 40 and 70 would be disproportionately affected, and either

(2)(a) that defendant knew or suspected that the operator evaluation system did not measure quantity of production, or

(2)(b) that defendant did not apply the operator evaluation system uniformly to all employees, regardless of age.

Nolting contends this instruction does not present the correct standard to determine a willful violation of the ADEA under the three-year statute of limitations.[7] Rather than focusing on whether Yellow Freight "knew or suspected" that the Operator Evaluation System violated the ADEA, Nolting submits the instruction should have asked whether Yellow Freight knew that the ADEA was "in the picture." Nolting draws this fine distinction from the Fifth Circuit's decision in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). *Coleman* appears to be the first case to construe the willful violation standard under the three-year statute of limitations of the Fair Labor Standards Act, 29 U.S.C. § 255, as amended in 1966, which the ADEA incorporates at 29 U.S.C. § 626(e)(1). In *Coleman*, the Fifth Circuit held that an "employer's decision to change his employees' rate of pay in violation of FLSA is 'wilful' when * * * there is substantial evidence in the record to support a finding that the employer *knew or suspected that his actions might violate the FLSA.* Stated most simply, we think the test should be: Did the employer know the FLSA was *in the picture?*" *Coleman*, 458 F.2d at 1142 (emphasis added).

Contrary to Nolting's interpretation, we believe that in this passage, the Fifth Circuit merely stated two alternative ways in which to present the question of an employer's willful violation of the Act. The Fifth Circuit's more recent affirmations of the

*Coleman* test support this conclusion: "an employer acts willfully and subjects himself to the three year liability if he knows, or has reason to know, that his conduct is *governed* by the Fair Labor Standards Act." *Donovan v. Sabine Irrigation Company*, 695 F.2d 190, 196 (5th Cir.), *cert. denied*, 463 U.S. 1207, 104 S.Ct. 37, 77 L.Ed.2d 1456 (1983) (quoting *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir.1974) (emphasis in original)). *See also Hill v. J.C. Penney Co.*, 688 F.2d 370, 374 (5th Cir.1982). Accordingly, we believe that the verdict director properly stated the applicable legal standard for determining a willful violation of the ADEA subject to the three-year statute of limitations.

■ In addition, Nolting argues that the inclusion of the element of willfulness in the verdict director placed too high a burden of proof on her. This argument lacks merit because, due to the untimely filing of the complaint, Nolting had to prove that Yellow Freight willfully violated the ADEA in order to make a prima facie case. Having concluded that the verdict director as given properly stated Nolting's burden of proof and the "willfulness" standard, we reject Nolting's additional contentions that the district court erred in not giving the instructions she offered as alternatives.

**2. Liquidated Damages**

■ In a related argument, Nolting contends the district court erred in giving the jury Instruction No. 10 regarding liquidated damages. Instruction No. 10 reads in pertinent part:

The term "willful" as used in this instruction means that:

(1) defendant knew or reasonably should have known the requirements of the Age Discrimination in Employment Act, and

(2) that the defendant knew or reasonably should have known that by using

---

**7.** As previously noted, 29 U.S.C. § 626(e)(1) incorporates the Fair Labor Standards Act statute of limitations, 29 U.S.C. § 255. In order to recover, Nolting needed to prove that Yellow Freight willfully violated the Act because Nolting filed out of time to assert a mere violation of the Act.

the operator evaluation system to determine who to lay off, defendant was discriminating against the plaintiff because of her age, and either

(3)(a) defendant knew or should have known that the operator evaluation system did not measure quantity of production; or

■(b) defendant did not apply the operator evaluation system uniformly to all employees, regardless of age.

Nolting first asserts that she did not have to prove a willful violation of the Act in order to recover liquidated damages. This contention is without merit because liquidated damages are available only upon proof of a willful violation of the Act. 29 U.S.C. § 626(b).[8]

■ In addition, Nolting contends the instruction improperly stated her burden of proving a willful violation. However, the willfulness standard contained in Instruction No. 10 actually placed on Nolting a lesser burden of proof than that announced by the Supreme Court in *TWA v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). In *TWA*, the Supreme Court stated that for purposes of liquidated damages, "a violation is 'willful' if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA'." 469 U.S. at 128, 105 S.Ct. at 625; *see also Gilkerson v. Toastmaster, Inc.*, 770 F.2d 133, 137 (8th Cir. 1985). Here, the instruction merely required the jury to find that Yellow Freight "knew or should have known" that its conduct violated the Act.[9] Because the willfulness standard of this instruction favored rather than prejudiced Nolting's case, we reject her allegation of error.

### 3. Juror Confusion

■ We are also unpersuaded that the similar wording of the willfulness elements in the verdict director and Instruction No. 10 confused the jury. It seems more likely that dissimilar standards would cause this effect. In any event, the similar wording occurred because one of the instructions favored Nolting with a lesser burden of proof. Furthermore, having found Yellow Freight not liable, the jury had no reason to consider the liquidated damage instructions. *See Grebin v. Sioux Falls Independent School District No. 49-5*, 779 F.2d 18, 21 (8th Cir.1985). Accordingly, we believe that these jury instructions contained no error prejudicial to Nolting.

### B. Business Necessity Defense

■ Nolting further contends that the district court improperly instructed the jury as to Yellow Freight's burden of proving the business necessity defense. Instruction No. 7 reads:

Your verdict must be for defendant if you believe:

First, the operator evaluation system was clearly related to the performance of work in the data entry department; and

Second, the operator evaluation system *significantly served* defendant's interest in quantity of production

unless you believe that there were other selection methods having less of an impact on employees between the ages of 40 and 70 which would achieve equally well the employer's interest in quantity of production (emphasis added).

Nolting asserts that by instructing the jury to find that the Operator Evaluation System "significantly served" Yellow Freight's interest in productivity, the district court submitted the wrong legal standard for determining whether a business necessity justified the practice. Nolting argues that the district court should have required the jury to find that Yellow Freight had a "compelling need" for the Operator Evalu-

---

**8.** 29 U.S.C. § 626(b) provides in part: "liquidated damages shall be payable only in cases of willful violations of this chapter."

**9.** The Supreme Court specifically rejected a lesser burden of proof of willfulness in this context

stating, "even if the 'in the picture' standard were appropriate for the statute of limitations, the same standard should not govern a provision dealing with liquidated damages." *TWA v. Thurston*, 469 U.S. at 127–28, 105 S.Ct. at 625.

ation System. In support of this contention, Nolting particularly relies on *Leftwich v. Harris-Stowe State College,* 702 F.2d 686 (8th Cir.1983) in which this court stated that to demonstrate business necessity, an employer "must show that their selection plan has 'a manifest relationship to the employment in question,' * * * [and] that there is a *compelling need* * * * to maintain that practice." *Id.* at 692 (emphasis in original) (*quoting Hawkins v. Anheuser-Busch, Inc.,* 697 F.2d 810, 815 (8th Cir. 1983)). *See also EEOC v. Rath Packing Co.,* 787 F.2d 318, 332 (8th Cir.1986) and *Kirby v. Colony Furniture Co.,* 613 F.2d 696, 705 n. 6 (8th Cir.1980). We note, however, that this court has also described the business necessity defense in disparate impact cases as requiring the defendant to show that the "practice is 'necessary to safe and efficient job performance'." *McCosh v. City of Grand Forks,* 628 F.2d 1058, 1062 (8th Cir.1980). *See also Roby v. St. Louis Southern Railway Co.,* 775 F.2d 959, 963 (8th Cir.1985).[10]

From these cases it appears that the Eighth Circuit has not clearly adopted a standard for such instructions.[11] Further, because the standards articulated by this court for the business necessity defense primarily arose in the context of Title VII litigation which does not provide for a jury trial, this court has not specifically addressed the scope of a permissible instruction.[12]

In terms of a jury instruction, we do not believe that a major difference exists between advising the jury to find that a practice significantly served the employer or that the employer had a compelling need for the practice. While a difference in degree exists between the two standards, in light of the ambiguity of the applicable

standard in this circuit, we do not believe the district court erred in submitting this instruction to the jury. The instruction also properly required the jury to find a clear relation between the Operator Evaluation System and the performance of work in the data entry department, and that no alternative method with a less discriminatory impact existed for determining productivity. The record shows that Nolting offered testimony that a test which measured keystroke accuracy might have less of an impact on older workers, but offered no data to support this conclusion. On the other hand, Yellow Freight's expert demonstrated that utilizing either age-neutral weighted scores or a keystroke per production hour method of evaluating data entry operators resulted in the same group of operators having the lowest production scores. In light of the evidence available for jury consideration, and the aforementioned ambiguity in the business necessity defense standard, we believe that the district court did not err in submitting Instruction No. 10 to the jury.

## C. Motion for Reconsideration of the Partial Summary Judgment Order

 Nolting finally asserts that the district court erred in denying her motion for a rehearing on the partial summary judgment motion or for reinstatement of her claim under the two-year statute of limitations. Nolting contends that the following genuine issues of material fact supported her motion: (1) that Nolting's original attorney told her that he had filed suit in late 1980 when in fact he did not file suit until July of 1982; and (2) Nolting's original attorney failed to inform her of any statute of limitations problems, Yellow Freight's

---

10. We further note that the Supreme Court has described the business necessity defense as a determination of whether the employer's legitimate employment goals of safety and efficiency are "significantly served by—even if they do not require" the rule or practice in question. *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587 n. 31, 99 S.Ct. 1355, 1366 n. 31, 59 L.Ed.2d 587 (1979).

11. For an analysis of how similar conflicting standards arose, *see Contreras v. City of Los Angeles,* 656 F.2d 1267, 1275–80 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).

12. Of the eight cases cited, only *Leftwich* arose under the ADEA; *Kirby* and *Roby* were race discrimination cases, while *Rath, McCosh,* and *Hawkins* were sex discrimination cases.

motion for summary judgment, or the court's partial summary judgment order. From these facts, Nolting asserts that her original attorney had no authority to waive her substantial right to a claim under the two-year statute of limitations. In view of these facts, Nolting contends that the district court should have reconsidered its summary judgment order and reinstated her claim under the two-year statute of limitations. In addition, Nolting argues that the district court should have applied the Doctrine of Equitable Tolling to her suit because Nolting diligently pursued the action even though her original attorney failed to timely file the claim. We disagree.

It is well-settled that a party is bound by the acts of her attorney. *See Link v. Wabash Railroad Co.*, 370 U.S. 626, 634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962). Although partial dismissal of an action due to counsel's malfeasance is a severe sanction, Nolting "voluntarily chose this attorney as [her] representative in the action, and [she] cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 633–34, 82 S.Ct. at 1390–91. *See also Sutherland v. ITT Continental Baking Co.*, 710 F.2d 473, 476–77 (8th Cir. 1983). As such, Nolting failed to raise a genuine issue of material fact to counter the order of partial summary judgment. *See* Fed.R.Civ.P. 56.

Moreover, the district court considered the equities of the situation and sympathized with Nolting's position, but concluded: (1) that the motion came too late; and (2) to a lesser extent, that granting the motion would prejudice Yellow Freight. As previously noted, Nolting's present counsel filed an appearance in February of 1984. The court established a number of pretrial filing deadlines in June and in August of 1984. However, it was not until the day after the final pretrial conference, one week before trial, that Nolting's present counsel discovered these facts and filed the motion. We must agree with the district court that "[o]f all the things that have happened in this case up to now, probably the most noteworthy has been the order granting partial summary judgment. It was not buried in some other order. It was a specific order directed to this issue. Any problem with that order * * * could and should have been discovered long before the last minute." Accordingly, we are unpersuaded that the district court erred in denying Nolting's motion.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.