_____

No. 95-3802
_____

Jerry O. Smith,                      *
                                     *
          Appellant,                 *
                                     *
     v.                              *
                                     *
City of Des Moines, Iowa,            *  Appeal from the United States
                                     *  District Court for the
          Appellee.                  *  Southern District of Iowa.
_____      *
                                     *
Equal Employment Opportunity         *
Commission,                          *
                                     *
          Amicus Curiae.             *

_____

          Submitted:  May 17, 1996

             Filed:  November 12, 1996
_____

Before BOWMAN, HEANEY, and WOLLMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.


     Appellant Jerry O. Smith brought suit against the City of Des Moines,
claiming that he was fired from his position as a city firefighter in
violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29
U.S.C. §§ 621-634 (1994), and the Americans With Disabilities Act of 1990
(ADA), 42 U.S.C. §§ 12101-12213 (1994).  The District Court[1] granted
summary judgment in favor of the city on all of Smith's claims.  Smith
appeals, and we affirm.

_____

     [1]The Honorable Harold D. Vietor, United States District Judge
for the Southern District of Iowa.

**I.**

At the time of his dismissal, Smith had been a firefighter with the Des Moines Fire Department for thirty-three years and had risen to the rank of fire captain. In 1988, the city began to require annual testing of all firefighters at the rank of captain or below to determine whether they could safely fight fires while wearing a self-contained breathing apparatus (SCBA). Each firefighter underwent spirometry testing, which gauges pulmonary function by measuring the capacity of the lungs to exhale. Any firefighter whose forced expiratory volume in one second ($FEV_1$) exceeded 70% of lung capacity was approved to wear a SCBA. If a firefighter scored less than 70%, he or she was required to take a maximum exercise stress test, which measures the capacity of the body to use oxygen effectively. The city required firefighters to establish a maximum oxygen uptake ($VO_2$ max) of at least 33.5 milliliters per minute per kilogram of body weight in order to pass the stress test.

Smith failed both tests in 1988 and was not approved to wear a SCBA that year. In 1989, 1990, and 1991, Smith passed the spirometry test and was approved for SCBA use. In August 1992, Smith narrowly failed the spirometry test and was referred to Dr. Steven K. Zorn, a consultant to the city, for further testing. In Dr. Zorn's office, Smith passed the spirometry test but registered a $VO_2$ max of only 22.2 on the stress test. The fire department placed Smith on sick leave. In January 1993, Smith returned to Dr. Zorn but scored only 21.1 on a stress test. The fire department offered to allow Smith to remain on sick leave until April, when he would turn age fifty-five and thus be eligible for retirement.

In the interim, the fire department sent Smith to another physician, Dr. John Glazier, for a second opinion. Additionally, when Smith did not file for retirement in April, the fire chief

filed an application for disability retirement on Smith's behalf. Before ruling on this application, the state pension board required Smith to be examined by a panel of three additional physicians. Dr. Glazier did not perform a stress test, but the panel of three physicians did (Smith's $VO_2$ max was 28.9). All four physicians concluded that Smith was physically capable of working as a firefighter. After receiving these recommendations, the pension board denied the application for disability retirement, finding that Smith was not disabled from working as a firefighter.

The fire department did not permit Smith to return to work but did offer to place him on leave of absence with benefits until July 1, 1994, when he would be eligible for maximum pension benefits. Smith did not file for retirement at that time, however, and the city discharged him on July 18, 1994 for failure to meet the fire department's physical fitness standards.

After obtaining right-to-sue letters from the Equal Employment Opportunity Commission (EEOC) and the Iowa Civil Rights Commission, Smith brought suit against the city in federal district court, raising claims under the ADEA, the ADA, and the Iowa Civil Rights Act, Iowa Code Ann. §§ 216.01-.20 (West 1994 & Supp. 1996). The District Court granted summary judgment in favor of the city on all counts. The court, assuming Smith could establish that the city's testing standards have a disparate impact on older firefighters, held that the city had established a "business necessity" defense because firefighters require "a high standard of physical fitness." Similarly, Smith's ADEA disparate treatment claim failed because he was not qualified for the job, and the state law claim failed because Iowa law mirrors federal law. The District Court also concluded that Smith did not have a disability and granted summary judgment for the city on his ADA claim. Smith's appeal raises only the disparate impact and ADA claims.

We have jurisdiction over Smith's appeal pursuant to 28 U.S.C. § 1291 (1994).  Our review of a grant of summary judgment is de novo.  Krenik v. County of Le Sueur, 47 F.3d 953, 959-60 (8th Cir. 1995).  We will affirm "only if the record, when viewed in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable factual inferences, shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Weber v. American Express Co., 994 F.2d 513, 515 (8th Cir. 1993).

**II.**

**A.**

We consider first the city's argument, which the District Court rejected, that a claim of disparate impact is not cognizable under the ADEA.  Disparate impact claims challenge "'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'"  Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977)).  A disparate impact plaintiff need not prove a discriminatory motive.  Id.

Like Title VII of the Civil Rights Act of 1964, to which the disparate impact theory was first applied in Griggs v. Duke Power Co., 401 U.S. 424 (1971), the ADEA contains two prohibitions relevant here:

It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age . . . .

29 U.S.C. § 623(a) (1994).

We have on several occasions applied disparate impact analysis to age discrimination claims.  See Houghton v. SIPCO, Inc., 38 F.3d 953, 958-59 (8th Cir. 1994) (reversing plaintiff's verdict because of erroneous jury instruction); Nolting v. Yellow Freight Sys., Inc., 799 F.2d 1192, 1196-99 (8th Cir. 1986) (affirming judgment for defendant); Leftwich v. Harris-Stowe State College, 702 F.2d 686, 690-93 (8th Cir. 1983) (affirming judgment for plaintiff).

Several years ago, in a disparate treatment case under the ADEA, the Supreme Court noted that it had never decided whether a disparate impact theory is available under the ADEA.  Hazen Paper, 507 U.S. at 610.  In a concurring opinion, three Justices stated that "there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA."  Id. at 618 (Kennedy, J., concurring).  Other language in the lead opinion can be read as a suggestion by the Court that the ADEA does not permit disparate impact actions.  See id. at 610 ("Disparate treatment, thus defined, captures the essence of what Congress sought to prohibit in the ADEA."); id. at 611 ("When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears.").

Before the Supreme Court decided Hazen Paper, many courts of appeals had recognized a disparate impact theory under the ADEA.  See EEOC v. Francis W. Parker Sch., 41 F.3d 1073, 1079 n.1 (7th Cir. 1994) (Cudahy, J., dissenting), cert. denied, 115 S. Ct. 2577 (1995).  Since Hazen Paper, several circuits have revisited the issue.  See DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 732-

34 (3d Cir.) (opinion of Greenberg, J., alone) (doubting disparate impact theory cognizable), cert. denied, 116 S. Ct. 306 (1995); Lyon v. Ohio Educ. Ass'n & Prof'l Staff Union, 53 F.3d 135, 139 n.5 (6th Cir. 1995) (noting doubt as to disparate impact theory); Francis W. Parker Sch., 41 F.3d at 1076-78 (suggesting disparate impact theory not cognizable); Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1474 (9th Cir. 1995) (suggesting disparate impact theory is cognizable); Ellis v. United Airlines, Inc., 73 F.3d 999, 1007-10 & n.12 (10th Cir.) (holding disparate impact theory not cognizable under § 623(a)(1) and suggesting it is not cognizable under § 623(a)(2)), cert. denied, 116 S. Ct. 2500 (1996).[2]

Our opinion in Houghton, however, postdated Hazen Paper and continued to recognize the viability of disparate impact actions under the ADEA. See Houghton, 38 F.3d at 958-59.[3] As a result, even if we believed that Hazen Paper cast doubt on the validity of Leftwich and Nolting, Houghton represents the law of this Circuit,

_____

[2]Some confusion has resulted from a difference between the ADEA and Title VII. Section 623(a)(2) of the ADEA governs employer conduct with respect to "employees" only, while the parallel provision of Title VII protects "employees or applicants for employment." Compare 29 U.S.C. § 623(a)(2) (1994) with 42 U.S.C. § 2000e-2(a)(2) (1994). Because Francis W. Parker School and Ellis were disparate impact actions involving applicants for employment, the plaintiffs in those cases were limited to relying on § 623(a)(1), which covers employees and applicants.

In this case, because Smith was an employee of the city, he may rely on either subsection of section 623(a). Our opinion in Leftwich (involving an applicant) established that a plaintiff may base a disparate impact claim on § 623(a)(1). Leftwich, 702 F.2d at 690. And the Supreme Court has made it clear in the Title VII context that the second subsection can be the basis for such a claim. See, e.g., Lorance v. AT&T Techs., Inc., 490 U.S. 900, 904 (1989); Connecticut v. Teal, 457 U.S. 440, 448-49 (1982); Griggs, 401 U.S. at 426 n.1.

[3]Like this case, Houghton involved incumbent employees. Id. at 956. The opinion does not specify the subsection of § 623(a) on which the disparate impact action was premised.

-6-

which we follow absent a "clear indication" that it has been overruled. <u>FDIC v. Bowles Livestock Comm'n Co.</u>, 937 F.2d 1350, 1354 (8th Cir. 1991). We conclude that disparate impact claims under the ADEA are cognizable.

**B.**

We assume, as the District Court did, that Smith has established a prima facie case of disparate impact, that is, that he has demonstrated "that a facially neutral employment practice actually operates to exclude from a job a disproportionate number of persons protected by the ADEA." <u>Leftwich</u>, 702 F.2d at 690. We therefore turn to Smith's argument that the District Court erroneously granted summary judgment to the city based on the so-called "business necessity" defense.

This defense is derived in part from the cases in which the Supreme Court developed the disparate impact doctrine under Title VII, <u>see</u>, <u>e.g.</u>, <u>Dothard v. Rawlinson</u>, 433 U.S. 321, 332 n.14 (1977) (physical requirements for prison guards with disparate impact on women "must be shown to be necessary to safe and efficient job performance"), and in part from a provision of the ADEA which states that an employment practice is not unlawful "where the differentiation is based on reasonable factors other than age." 29 U.S.C. § 623(f)(1) (1994).[4] We recognize that in the Title VII context the business necessity defense has undergone several transformations in recent years. <u>See</u> <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642, 659 (1989) (placing burden of persuasion on

---

[4]Title VII contains no provision parallel to the "reasonable factors other than age" language in the ADEA. <u>See</u> 42 U.S.C. § 2000e-2(e) (1994). Nevertheless, the EEOC, as amicus curiae and in its regulations interpreting the ADEA, suggests that the business necessity defense is the same under Title VII and the ADEA. <u>See</u> 29 C.F.R. § 1625.7(d)-(e) (1995). For reasons that will be made clear in the text of this opinion, we need not decide this issue in this case.

plaintiff and broadening the defense); Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071, 1074-75 (codified at 42 U.S.C. § 2000e-2(k) (1994)) (attempting to restore pre-Wards Cove law).  Our most recent ADEA disparate impact opinion reflected the shift to the Wards Cove standard, see Houghton, 38 F.3d at 959, but we have not yet considered whether the Civil Rights Act of 1991 has affected the ADEA's business necessity defense.

We need not decide that issue in this case.  In granting summary judgment for the city, the District Court clearly placed the burden of persuasion on the city in a manner consistent with the pre-Wards Cove standard.  For purposes of our analysis, we therefore assume, without deciding, that pre-Wards Cove law--the law most favorable to Smith--applies here.  In the context of a physical job requirement, the pre-Wards Cove business necessity defense places the burden of persuasion on the defendant to show that the requirement has "a manifest relationship to the employment in question," Griggs, 401 U.S. at 432, and that it is "necessary to safe and efficient job performance."  Dothard, 433 U.S. at 332 n.14.  See McCosh v. City of Grand Forks, 628 F.2d 1058, 1062 (8th Cir. 1980) (applying this test to Title VII case involving job requirements for police sergeants); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1119 (11th Cir. 1993) (holding, in Title VII case involving firefighters and SCBAs, that "[m]easures demonstrably necessary to meeting the goal of ensuring worker safety are therefore deemed to be 'required by business necessity'").

It follows that the city, as the party with the burden of persuasion on the business necessity defense, was required to support its summary judgment motion "with evidence that would entitle it to a directed verdict if not controverted at trial."  Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  If the city met that burden, the burden of production then shifted to the nonmoving party, Smith, to

show the existence of a genuine issue of fact for trial.  Id.  Using this framework, we review Smith's objections to the District Court's grant of summary judgment.

We conclude that the city met its burden on the business necessity defense by supporting its motion with evidence that would entitle it to a directed verdict if not controverted by evidence sufficient to create a jury issue.  On the job-relatedness issue, the city presented undisputed evidence that a captain is frequently involved in fire suppression activities when a company arrives at a fire scene and that the captain wears a SCBA under those circumstances.  Joint Appendix (J.A.) at 157-59, 302.  This evidence alone is sufficient to carry the city's burden of showing that its fitness standard has a "manifest relationship" to the position in question.  Griggs, 401 U.S. at 432.

The other element of the defense is whether the standard is necessary to safe and effective job performance.  The city's evidence on this issue is more complicated and begins with some of the extensive regulations governing the manner in which the city operates its fire department.  Federal regulations require the fire department to provide firefighters with SCBAs "when such equipment is necessary to protect the health of the employee."  29 C.F.R. § 1910.134(a)(2) (1995).[5]  The city may not assign firefighters to tasks requiring use of a SCBA unless they are "physically able to perform the work and use the equipment."  Id. § 1910.134(b)(10).  The city must review the medical status of SCBA users periodically.  Id.  The American National Standards Institute (ANSI) standard on physical qualifications for respirator use recommends spirometry

---

[5]The federal regulations do not apply to the city directly. See 29 U.S.C. § 652(5) (1994) (excluding states and political subdivisions from coverage of Occupational Safety and Health Act). The Iowa occupational safety and health laws do apply to the city, however, Iowa Code Ann. § 88.3(5) (West Supp. 1996), and the applicable state regulations adopt the federal regulations by reference.  Iowa Admin. Code r. 347-10.20(88) (1996).

testing as a screening mechanism for SCBA users and suggests stress testing for persons who use SCBAs under strenuous conditions. J.A. at 338. ANSI recommends a 70% $FEV_1$ threshold for spirometry testing but does not specify an acceptable result for stress testing. Id.

To reach its determination that a $VO_2$ max of 33.5 was the appropriate threshold for stress testing, the city relied on a review of the relevant medical literature by Dr. Zorn. A number of studies suggest that firefighters consume between 25 and 35 milliliters of oxygen per kilogram per minute while suppressing a fire. J.A. at 200. One study in particular involved 150 firefighters performing a series of tasks in a simulated fire-suppression environment. Id. at 212-22. The authors of that study determined that a $VO_2$ max of 33.5 was the minimum required to allow the firefighters to complete the simulation successfully. Id. at 218. The authors then repeated the simulation with 32 additional firefighters. Id. Of those with a $VO_2$ max less than 33.5, only 40% (4 of 10) completed the simulation successfully. Id. On the other hand, of those with a $VO_2$ max of 33.5 or more, 86% (19 of 22) completed the simulation successfully.[6] Id. After reviewing this study and others, Dr. Zorn concluded that 33.5 was the minimum satisfactory $VO_2$ max requirement for the Des Moines firefighters. J.A. at 83. This evidence would clearly be sufficient to entitle the city to a directed verdict on the issue of necessity if it were uncontroverted. See Firemen's Fund, 8 F.3d at 1310.

We now turn to the evidence presented by Smith in opposition to the city's summary judgment motion. Smith does not dispute that firefighting is a strenuous occupation or that the city has a legitimate interest in determining whether its employees can

---

[6]The city's brief repeatedly refers to this pass rate as "at least 70%." We are not sure why the city uses this figure, but it makes little difference to our analysis whether the number is 70% or 86%.

perform those duties safely. On the issue of job-relatedness, he does argue that as a captain, he did not perform the same duties as a line firefighter, and that the 33.5 threshold is therefore not related to his particular position. But as we noted above, it is undisputed that Smith and other captains do enter burning buildings and perform fire suppression activities when their companies arrive at a fire scene; as Smith himself stated, "if we were the first to arrive, I would don a mask, go right in and attack the fire." J.A. at 301-02. Although Smith also stated that he would "[v]ery seldom" perform tasks like knocking down walls, id., this evidence is insufficient to create a jury issue on job-relatedness in light of the uncontroverted evidence that he was required to fight fires while wearing a SCBA.

On the issue of whether the requirement is necessary to safe and effective job performance, Smith argues that the opinions of the panel of physicians who determined he was not disabled for purposes of disability benefits, plus the opinion of Dr. Glazier that Smith is capable of performing exertional tasks while wearing a SCBA, create a fact issue. We disagree. We note first that these physicians examined Smith in the context of a disability retirement proceeding. A member of a police or fire department in Iowa is eligible for disability benefits if the examining physicians certify "that the member is mentally or physically incapacitated for further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired." Iowa Code Ann. § 411.6(3) (West Supp. 1996). Even though the disability determination was phrased in broader language than the statute ("He does not have any limitation which would preclude him from working as a firefighter . . . and in our opinion he should be reinstated fully to work as a firefighter," J.A. at 360), the physicians' conclusions lack probative value on the relevant issue in this case: whether the fitness standard set by the city is necessary to safe and efficient job performance. The opinions of these physicians, aside from being geared to the question of

-11-

Smith's entitlement to disability benefits, do not appear to have considered the solid scientific studies on which the city based the 33.5 $VO_2$ max standard.[7]  Such evidence affords no basis for allowing a jury to second-guess the city's well-supported and reasonable conclusion that, in the interest of the safety of its firefighters (including captains) and their effective job performance, the appropriate place to draw the line was at a $VO_2$ max of 33.5.  We thus conclude that Smith has not demonstrated a factual dispute on this issue.

To summarize our conclusions:  fitness and the ability to perform while wearing a SCBA are undoubtedly job-related and necessary requirements for firefighters.  The dispute in this case is not whether firefighters must be physically fit, but how fitness can be most appropriately measured and how the city may distinguish those firefighters who are probably capable of performing the job from those firefighters who are probably not capable.  The city has not proceeded arbitrarily, but rather has carefully developed a standard based upon the available medical literature and using the

_____

[7]Two members of the panel of three physicians later reviewed the primary study, detailed above, on which the city relied in setting the 33.5 $VO_2$ max standard.  They concluded:

> Dr. Moseley and I do not believe that this study justifies identifying Mr. Smith as unable to fulfill the duties of a firefighter.  In fact, Mr. Smith's exercise capacity was 110% [of] predicted for his age and size.  I therefore believe that Mr. Smith is fully capable of working as a firefighter and recommend that he return to work.

J.A. at 361.  This evidence comes closer to addressing the necessity of the 33.5 standard, but it is ultimately only an opinion that Smith be permitted an exception to the fire department's policy.  The physicians do not suggest that the study is inaccurate or that the fitness standard is unreasonable.  We also note that whether Smith's performance on the stress test exceeded the physicians' expectations is irrelevant.

best test available for measuring fitness, the stress test.[8]  J.A. at 81.
The literature indicates that a high proportion of firefighters with a $VO_2$
max above 33.5 can perform fire suppression tasks successfully, but a much
lower proportion of those with a $VO_2$ max below 33.5 can do so.  Smith
argues, and the physicians' evaluations suggest, that some firefighters
with lower $VO_2$ max scores--Smith in particular--may be able to perform
their jobs.  This may well be true, but the law does not require the city
to put the lives of Smith and his fellow firefighters at risk by taking the
chance that he is fit for duty when solid scientific studies indicate that
persons with test results similar to his are not.  The lack of a precise
or universally perfect fit between a job requirement and actual effective
performance is not fatal to a claim of business necessity, particularly
when the public health and safety are at stake.  See McCosh, 628 F.2d at
1062-63; cf. Fitzpatrick, 2 F.3d at 1120-21 (lack of unfortunate incidents
in the past insufficient to create genuine issue of fact as to necessity
of safety requirements).  We conclude that Smith has not met his burden of
presenting a triable issue on the business necessity defense.

## c.

Smith also argues that he presented evidence of an alternative means
of assessing fitness that would have less of a disparate impact on older
firefighters.  In particular, he suggests that the city use the spirometry
and stress tests to determine which firefighters may be unfit for the job,
then require those firefighters to undergo a physical examination and "a
battery of

---

[8]Because the city is measuring fitness directly, this case is
distinguishable from Dothard, where the job (prison guard) required
a degree of strength but the defendants did not show any
correlation between the requirements (minimum height and weight)
and the strength required for the job.  See Dothard, 433 U.S. at
331.

tests" to determine whether they are actually fit for duty.  Appellant's Br. at 24.

We have not previously had the occasion to determine whether this branch of the Title VII disparate impact doctrine applies to the ADEA.  For purposes of this appeal, however, we assume that the Title VII framework applies:  once the defendant has met its burden of demonstrating business necessity, the plaintiff may still prevail by showing "that other selection devices without a similar discriminatory effect would also serve the employer's legitimate interest in efficient and trustworthy workmanship."  Dothard, 433 U.S. at 329 (quotations omitted).  For several reasons, Smith's argument on this point is unavailing.

First, it does not appear from the record that Smith advanced this argument before the District Court.  We will not reverse a grant of summary judgment on the basis of an argument not presented below.  See, e.g., O.R.S. Distilling Co. v. Brown-Forman Corp., 972 F.2d 924, 926 (8th Cir. 1992).  Even if the argument were proper, however, Smith has not made any showing that his proposed alternative (which is in any case rather vague) would have less of a disparate impact on older firefighters than the city's present system does.  At most, Smith has asserted that he would be able to pass his proposed battery of tests, but he has not shown the effect of his system on other firefighters.  Nor has he shown that his more subjective approach would serve the city's legitimate interest in the fitness of its firefighters as well as the current system.  Smith has failed to raise a genuine issue of material fact on this branch of the disparate impact doctrine.

**III.**

Finally, we consider the District Court's grant of summary judgment in favor of the city on Smith's ADA claim.

-14-

The ADA prohibits employers from discriminating 'against a qualified individual with a disability because of the disability of such individual.' 42 U.S.C. § 12112(a). A plaintiff seeking relief under the ADA must establish that he is a disabled person within the meaning of the ADA, that he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and that he was terminated because of his disability.

Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995). The ADA defines "disability" with respect to an individual as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1994). Because the fire department filed for disability retirement on his behalf, Smith claims that the city regards him as having a disability. The parties agree that Smith is not in fact disabled. Amend. Compl. ¶ 26; Answer ¶ 20.

We rejected a claim similar to Smith's in Wooten. In that case, we recognized that "working" is a "major life activity" that, if substantially limited by an impairment, brings an individual within the protection of the ADA. Wooten, 58 F.3d at 385-86. We also held, however, that "'working' does not mean working at a particular job of that person's choice" and recognized that "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." Id. at 386 (quotation omitted); see also 29 C.F.R. § 1630.2(j)(3)(i) (1996) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."). We then applied these principles to a "regarded as" situation in which Wooten claimed that his former employer regarded

-15-

him as having a disability, and we affirmed a grant of summary judgment for the employer.  <u>Wooten</u>, 58 F.3d at 386.

Smith's claim fails for the same reasons that Wooten's did.  Viewing the record in the light most favorable to Smith, we see that the city regarded Smith as unable to perform the duties of a firefighter.  But Smith does not suggest that the city believed he was unable to perform other jobs, and he has presented no evidence to support that proposition.  In fact, in a letter to Smith in December 1993, the fire chief recognized that Smith had gone back to school and had taken another job while he was on sick leave from the fire department.  J.A. at 267.  Smith failed to create a genuine issue of fact as to whether the city regarded him as having a disability for purposes of the ADA, and the District Court properly granted summary judgment on this claim.

**IV.**

The judgment of the District Court is affirmed.

HEANEY, Circuit Judge, concurring in part and dissenting in part.

I concur in parts I, IIA, and III of the majority's opinion.  I respectfully dissent, however, from the majority's conclusion in parts IIB and IIC that the city was entitled to summary judgment on Smith's age discrimination claim.  I certainly agree that a high level of physical fitness is related to the job of a firefighter and that the city must develop a policy that ensures safe and efficient job performance.  In my view, however, the city has not adequately demonstrated that its fitness standard has a manifest relationship to the duties of a fire captain.  Nor has the city produced sufficient evidence to support a finding that its policy of dismissing all employees who fail to meet the standard is necessary for their safe and efficient job performance.  Moreover, contrary to the majority's position, the opinions of four

-16-

physicians who independently examined Smith and determined that he was fit to perform his firefighting duties, directly rebut the necessity of the city's policy. At a minimum, therefore, I do not agree that summary judgment was appropriate for Smith's age discrimination claim and would remand to the district court for a full trial on the merits.

To prevail in its business necessity defense, the city must validate its fitness test for job-relatedness to the particular skills and exertional requirements of a fire captain, the position at issue in this case. See Albermarle Paper Co. v. Moody, 422 U.S. 405, 431, 45 L.Ed. 2d 280, 304 (1975). As the ANSI report recommends, for a proper fitness evaluation, an examiner must consider meaningful work-related information, including the type of activity to be performed, the level and duration of effort required. (J.A. at 336.)

To justify its fitness standard, the city relies solely on Dr. Zorn's conclusion based on his review of a report of a study in which he did not participate. The study tested the ability of a sample group of firefighters to complete a series of tasks that were "designed to simulate the duration, intensity, and types of tasks that are performed during firefighting." (J.A. at 215.) As the majority states, a fire captain is frequently involved in fire suppression activities when a company arrives at a fire scene. Yet, as both Chief Phillips and Chief Morgan testified, a fire captain spends much less time in the structure fighting the fire than firefighters and the captain's main role is directing, not participating in, the fire suppression. (J.A. at 151, 170.) Dr. Zorn acknowledged that it would be "reasonable" to adjust the fitness requirements for different positions, depending on the amount of time each position spends suppressing the fire. He left those decisions to the fire department. (J.A. at 130.) The city has made no attempt to link its fitness standard specifically to

the job requirements of a fire captain.  Thus, the standard cannot be justified as a business necessity.

Even if a fitness standard for firefighters could justify the dismissal of a fire captain, there is conflicting evidence in the record as to whether the test used and the specific fitness level set by the city are reasonable.  After reviewing the study and discussing its findings with Dr. Zorn, Dr. Schwartz wrote to the fire department:  "Dr. Moseley and I do not believe that this study justifies identifying Mr. Smith as unable to fulfill the duties of a firefighter."  (J.A. at 361.)  Dr. Schwartz testified that the $VO_2$ minimums set by the city are unreasonable and that, in his opinion, the city should not rely on a single test for its fitness evaluation.  (J.A. at 179-80.)  With this conflicting evidence as to the validation of the standard, Smith's claim should have survived summary judgment.

In addition to the insufficient evidence of a "manifest relationship" between the fitness standard and Smith's job requirements, the city has not demonstrated the necessity of its policy requiring dismissal of all those who fail the fitness test.  The city argues that its policy is necessary because federal regulations and ANSI recommendations require fire departments to ensure the safety of its employees.  Neither authority requires as strict a policy as the city has adopted for its firefighters, however.  Moreover, the study on which the city relies for its standard does not recommend that employees failing to meet the standards be fired.  Rather, the study suggests that employees who cannot meet the standards be given a specialized exercise regime to improve their levels of cardiopulmonary fitness.  As the authors of the study recognize,

> policies that select and/or retain on the basis of fitness but are not accompanied by programs emphasizing fitness may be vulnerable to legal challenge.  Initiating

-18-

entry expectations at a level allowing for a reasonable decline with advancing age is one step but this should be accompanied by weight control, exercise, and smoking cessation programs with periodic individualized assessment.

(J.A. at 221.)

In a letter to Dr. Zorn, Sothmann recommends:

a proactive approach where individuals below the expectation are given time to improve through an established policy negotiated by concerned parties (e.g. administration, union, medical, human rights). An unwillingness to adhere or failure to achieve the expectation should be treated on a case by case basis with additional information to decide employment implications.

(J.A. at 256.) The city did not implement these recommendations. Where a fitness test so disparately affects persons protected by the ADEA, the city should at least attempt to minimize the effect by giving its employees an opportunity to improve their physical condition.

To further rebut the necessity of the city's fitness standard, Smith has presented substantial evidence that, despite failing the city's test, he was fit to perform firefighting duties. Dr. Glazier, who examined Smith to provide a second opinion, stated that based on spirometric findings, "[Smith] is capable of performing exertional tasks while wearing SCBA." (J.A. at 364.) The three doctors who evaluated Smith for his disability pension status thoroughly examined him. Each concluded separately not only that Smith was not disabled but also that he was fit to return to work as a firefighter. As the EEOC asserted in its amicus brief, the opinions of the four doctors that Smith's cardiopulmonary capacity would not prevent him from performing the duties of his job safely and efficiently is sufficient to create a triable issue of fact as to whether the city's standard is justified by business necessity.

The majority characterizes the dispute in this case as how fitness can be "most appropriately measured." Rather, the real dispute is whether the city's policy, which has a disparate impact on persons protected by the ADEA, has a manifest relationship to the job of a fire captain and whether

it is necessary for the safe and efficient performance of the captain's job.  In my view, plaintiff presents sufficient evidence to counter both elements of the business necessity defense.  Thus, Smith's age discrimination claim should have survived summary judgment.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.